IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

TAYLOR P., by and through her parents,  )
CHRIS P. and CARRIE C.,  )
  )
      Plaintiffs,  )
  )
  v.  )
  )
MISSOURI DEPARTMENT OF  )
ELEMENTARY AND SECONDARY  )
EDUCATION and POPLAR BLUFF R-I  )
SCHOOL DISTRICT,  )
  )
      Defendants.  )   Case No. 06-4254-CV-C-NKL
  )
POPLAR BLUFF R-I SCHOOL DISTRICT,)
  )
      Counterclaim Plaintiff,  )
  )
  v.  )
  )
CHRIS P., CARRIE C., NEAL TAKIFF,  )
and JENNIFER HANSEN,  )
  )
      Counterclaim Defendants,  )
  )

ORDER

Plaintiffs Chris P. and Carrie C. (the Parents) bring this action on behalf of their

daughter, Taylor P., under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.

§ 1400 *et seq.*, to challenge the result of a due process hearing (the hearing) held January 23-

27 and March 27-29, 2006. The Poplar Bluff R-I School District (the District) counterclaims

1

for prevailing party attorney's fees against the Parents and their former attorneys under 20 U.S.C. § 1415(i)(3)(B)(i)(II)-(III). The following motions are currently pending before the Court: (1) the District's Motion for Summary Judgment or, in the alternative, for Judgment on the Administrative Record [Doc. # 39]; (2) the District's Motion for Summary Judgment on the District's Counterclaim [Doc. # 41]; (3) the Parents' Motion for Summary Judgment [Doc. # 43]; (4) Defendant Missouri Department of Elementary & Secondary Education's (the Department) Suggestions in Support of the District's Motion for Summary Judgment [Doc. # 49]; and (5) Counterclaim Defendants Jennifer Hansen and Neal Takiff's Motion to Strike the District's Motion for Summary Judgment on the Counterclaim [Doc. # 50]. This Court now grants the District's and the Department's Motions for Judgment on the Administrative Record, and denies the remaining motions.

## I.     Factual Background[1]

### A.     Taylor's Initial Placement at Poplar Bluff R-I School District

At issue in this case is whether the Poplar Bluff R-I School District failed to formulate appropriate individualized education programs (IEP) for Taylor, beginning in July/August

---

[1]The administrative record in this case is quite large, including: 8 volumes containing the transcripted proceedings of the administrative hearing; 4 volumes of Respondent's exhibits; 2 volumes of Petitioner's exhibits; the 62-page, single-spaced administrative hearing opinion including findings of fact, with dissent; as well as numerous other documents. As a result of this sizable record, much of the text contained in the Court's Factual Background is taken directly from the administrative panel's Findings of Fact, as well as the parties' motions, without citation. However, recognizing the Court is required to make an independent determination of the issues using a preponderance of the evidence, giving "due weight" to agency decisionmaking, the Court states that in quoting without citation it has reviewed the record and independently determined those facts to be true by a preponderance of the evidence. *See CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 636 (8th Cir. 2003).

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 2 of 81

of 2004. Although the Parents do not allege that IEPs prior to July/August 2004 were inadequate, the Court recites facts from this earlier time for background purposes.

Taylor is the young, adopted daughter of Chris P. and Carrie C. During her infancy, she had ear infections and on two occasions had tubes inserted in her ears. On November 8, 2001, Taylor's hearing was formally assessed, but the results were deemed invalid. In January of 2002, her hearing was assessed again and determined to be within normal limits bilaterally. On January 30, 2002, Taylor's speech and language were assessed, but there were no concerns about her hearing. According to this evaluation, Taylor demonstrated a slight delay in her expressive language skills and it was recommended that she receive direct speech therapy. The evaluation also concluded that Taylor's receptive language skills were within normal limits.

From February through April of 2002, Taylor attended four speech therapy sessions, at which point they were discontinued due to "time constraints." On October 11, 2002, Taylor's speech and language was evaluated at St. Louis University because her parents were concerned about her late speech onset, her indistinct speech and her use of only two to three word sentences. The University's report noted that Taylor had reached developmental milestones within normal limits, although she was still not toilet trained at three years of age. The report stated that Taylor "typically expressed herself with gestures, facial expressions and minimal verbalizations." Taylor received a standard score of 86 in the area of auditory comprehension and her receptive language skills were good. She received a standard score of 74 in expressive communication. The evaluator's clinical impression was that Taylor had

a profound speech/phonological disorder and expressive language delay, although the evaluator did not diagnose her with a receptive language delay or disorder. It was recommended that Taylor go to speech and language therapy as soon as possible, and that "the consideration of a diagnosis of childhood apraxia should be further explored."

On October 14, 2002, Chris P. contacted Berla Bieller, a psychological examiner for the District, regarding Taylor's possible receipt of special education services. Bieller spoke with Chris P. the next day, where he was informed that Taylor had a speech delay but no other developmental concerns. On October 22, 2002, Chris P. took Taylor to the District for screening and was given a copy of the IDEA procedural guidelines, informing him of the appropriate steps to take if he wanted to seek reimbursement for placing Taylor privately. Taylor failed the hearing screening. Chris P. indicated to Bieller that he would talk to Taylor's pediatrician. On October 1, the District received a note from Taylor's pediatrician stating that her hearing was within normal limits.

On November 15, 2002, the District convened a multidisciplinary team to prepare an evaluation plan designed to determine if Taylor was a student with a disability as defined by the IDEA. The team did not evaluate Taylor's hearing because her pediatrician informed the District it was not a concern. On November 18, 2002, Bieller wrote to the Parents, requesting their consent for the proposed evaluation and enclosing another copy of the IDEA procedural safeguards. Chris P. gave his written consent on November 25, 2002.

On January 10, 2003, the District's multidisciplinary team met and concluded that Taylor qualified for IDEA services under the Young Child with a Developmental Delay

(YCDD) category. The District kept and maintained meeting notes, as is its practice, to ensure an accurate record. Taylor's identified delays were in the areas of communication, including speech and language, but not hearing. The entire team, as well as Chris P., agreed with that conclusion. The multidisciplinary team also developed an initial IEP for Taylor, in which Chris P. also participated. The initial IEP noted that the present level of Taylor's speech was very unintelligible and her speech delays could impact her prereading skills and phonemic awareness. The IEP's goals and objectives included: articulation, phonology, receptive and expressive language, preacademics, fine motor and adaptive behavior. The IEP proposed a placement that included 30 minutes per week of speech therapy and 30 minutes per week of language therapy, in addition to 660 minutes per week of early childhood special education. According to the IEP, Taylor would be placed in the early childhood special education classroom for 100% of the day, although she would spend some social time with her nondisabled peers. At the meeting, Chris P. did not express any disagreement with the IEP and provided his written consent to Taylor's special education placement.

Taylor was placed in the District's early childhood special education program in January 2003. As part of that program, Jeanine Bradley, the District's speech-language pathologist, provided speech language therapy to Taylor, working with Taylor one-on-one and in small group settings of one to three students. Bradley worked with Taylor from January to May 2003, and from August 2003 to May 2004, in which time Taylor made progress in the speech and language area. Christy Smith was Taylor's special education teacher from January 2003 to May 2004, and was Taylor's classroom teacher during the

5

initial evaluation and diagnostic teaching period. As part of Taylor's initial evaluation, Smith reported that from November 2002 to May 2003, Taylor learned to name more colors, to cut on a line and to copy her first name and shapes. She could balance for five seconds on one foot and improved in identifying objects and naming shapes. Taylor's expressive language also improved. Smith testified at the hearing that Taylor made progress on the initial IEP and met most of her goals by next year.

On April 17, 2003, Taylor's IEP determined she was eligible for extended school year services (ESY) from June 2 to July 31, 2003. Chris P. participated in the meeting and agreed with the decision. During the 2003-2004 school year, Taylor continued participating in the District's early childhood special education program on a half-day basis, attending a daycare facility during the other half day. She continued making progress on her IEP goals. Smith continued to be Taylor's teacher and Bradley continued providing her speech and language therapy. Although initially shy, by the end of the 2004 academic year, Taylor appeared very confident going to speech class, spoke most of the time, and was able to effectively communicate with her peers. At the hearing, Smith testified that based on the four-year-old checklist she completed during the year, she believed Taylor was ready to enter kindergarten in the fall of 2004.

During the 2002-2003 and 2003-2004 school years, Bradley worked with Taylor one-on-one and in small groups. At times, she "pushed-in" to Smith's classroom, meaning she would work with Taylor while she was still with her special education class. Smith also reinforced Taylor's speech and language goals, and Bradley testified it was important for all

6

staff working with Taylor to provide reinforcement in those areas. On December 19, 2003, the IEP team met to review Taylor's IEP, to develop a new IEP and to consider a change in her special education minutes. At the meeting, Chris P. only expressed concerns about Taylor's speech and Taylor remained categorized as a Young Child with a Development Delay due to speech and language concerns. The team discussed Taylor's progress as reflected in the IEP present level and whether she should spend some time in a Title I classroom with typical four-year-old peers for socialization in anticipation of kindergarten. The progress notes from the meeting state, "Taylor's disability affects her progress in the participation in age appropriate activities . . . . She is not yet able to copy or print her name. She is not able to tell what a clock or calendar does . . . . Taylor's speech and language deficits make it difficult to communicate affectively [sic] with peers and adults." Chris P. expressed uncertainty about sending Taylor to kindergarten for the 2004-2005 school year, but did agree to allow Taylor to go to a regular classroom for some amount of time during the week. The team agreed to wait until April 2004 to discuss kindergarten.

The December 2003 IEP included goals and objectives in the following areas: preacademics, time, speech articulation, and receptive expressive language. The team also agreed to change Taylor's placement by reducing her minutes in special education and increasing her time in regular education (through the use of the Title I classroom). As a result, the IEP proposed a placement of 71% of the time in special education with the rest of Taylor's school day spent in the Title I classroom. The IEP indicated that Taylor was not

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 7 of 81

deaf or hearing impaired and did not use an assistive hearing device. Chris P. waived the 10-day waiting period, requesting immediate implementation of the change.

Taylor began attending the Title I classroom with her nondisabled peers for 45 minutes per day during the children's social time, beginning in January 2004. Sally Clark was her regular education teacher. In the afternoons, she continued attending a daycare facility. Taylor showed no reluctance attending the Title I classroom and enjoyed her time there. On the days she did not receive speech-language therapy, she received services in Christy Smith's classroom for approximately one hour and 45 minutes. Smith and Bradley testified at the hearing that Taylor benefitted from being in the Title I classroom. Although Taylor was initially shy in the Title I classroom, she started to speak to the other children as she got to know them.

On April 2, 2004, Taylor's IEP team met to discuss extended school year services. At this meeting, Chris P. explained he wanted Taylor to start kindergarten a year late; the District agreed that Taylor could remain in the early childhood education setting for an additional year. The team agreed to this because it decided to honor the Parents' wishes, as well as Taylor's late birth date and her lack of maturity made it appropriate. Although Smith believed that Taylor was ready to transition to kindergarten, she too agreed with the team's decision to honor the Parents' wishes. Also at this meeting, the team discussed meeting again in August 2003 to reduce Taylor's special education minutes and increase her speech-language therapy minutes. Smith testified at the hearing that she was going to recommend

8

in August that Taylor's time in her special education classroom be reduced so that her time in a regular classroom could be increased.

### B. Discovery of Taylor's Hearing Loss and Unilateral Placement at Moog

In the summer of 2004, Taylor attended extended school year services at the District's early childhood center where she received some services from Wray Ann Williams, a District paraprofessional. During the summer, Williams became concerned about Taylor's hearing and discussed the situation with Chris P., who initially questioned Williams's assessment because Taylor had been evaluated for hearing loss several times previously. On July 12, 2004, Taylor was diagnosed with a hearing impairment. She was fitted with a hearing aid in her right ear. On July 14, 2004, Taylor's hearing was also assessed at St. Louis Children's Hospital and a loss was confirmed. The audiologist at the hospital provided the family with information about several private schools, including the Moog Center for Deaf Education (Moog) in St. Louis County, Missouri. When he returned the next session, Chris P. informed Williams that Taylor's hearing had been assessed and that she had a hearing loss. He was apologetic for becoming angry with Williams earlier. Although he did not mention specifics to Williams, Taylor did return to the summer program on the last day of summer school during the week of August 1, 2004, with a hearing aid in her right ear. Williams and Chris P. discussed what resources might be available, but Chris P. did not indicate he was looking to place Taylor in a private school. He did not communicate the new diagnosis to anyone else at the District.

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 9 of 81

After the diagnosis of Taylor's hearing loss, the Parents did not contact the District to request a reevaluation or request that Taylor's educational diagnosis or IEP be modified. Amy Jackson, the District's director of special services, stated at the hearing that had the Parents requested that the District modify Taylor's diagnosis or her IEP in response to the change in her hearing, the District would have been willing to honor that request. However, the fact that Taylor had suffered a hearing loss over the summer would not have necessarily prompted an immediate reevaluation by the District as the District had not been informed of the nature and extent of that loss.

Although they did not make a formal request to or contact the District, after Taylor's hearing loss was diagnosed, the family scrambled to gather information about their options. They were in contact with the staff at Moog who told them that Taylor needed to be in a full-time self-contained program for deaf oral education. Thus, the Parents began looking at private schools in St. Louis and considering whether to break up the family. The Parents did not ask the District what services it might have to offer, did not request a revised IEP and did not ask whether the District might be willing to contract with Moog. Chris P. testified at the hearing that "[o]ur general ideas [sic] that they really did not have an oral deaf educational program," and that "we didn't think that, you know, we didn't need to tell the local school all the things we were doing."

On August 9 and September 1, 2004, the Parents had Taylor's speech and language evaluated by Dr. Carol Ludwig. In her report, Dr. Ludwig wrote that Taylor had been diagnosed with a profound sensorineural hearing loss in the left ear and a moderate/severe

sensorineural hearing loss "in the past year" and had been fitted with "binaural 100% digital hearing aids," although the Parents reported that only a hearing aid for the right ear was obtained since the loss in the left was too severe. Dr. Ludwig diagnosed Taylor with verbal apraxia and recommended daily speech and language rehabilitation through a speech-language pathologist; she did not make any recommendation concerning a school placement for Taylor. Dr. Ludwig's evaluation was obtained and completed without notification to the District.

On August 13, 2004, the Parents had Taylor's cognitive ability assessed at Moog without notification to the District. When the Poplar Bluff School District began the 2004-2005 school year in August, Christy Smith was informed of Taylor's hearing loss and anticipated that Taylor would return to her early childhood program as discussed in April. On August 18, 2004, Smith telephoned the Parents' home to schedule a date to enroll Taylor. She was informed by the Parents' housekeeper that Taylor would not be returning to the District, but would instead begin attending school in St. Louis. The Parents never returned Smith's call, and as a result, Smith did not know where Taylor was or where she was attending school.

On August 19, 2004, Carrie C. signed a release of records form to give the District permission to release records to "2 different schools" with respect to a possible move or transfer. According to Chris P., the family asked for the records because both Moog and St. Joseph's Institute for the Deaf had requested them. When Carrie C. picked up the records, she informed Bieller that the family was considering a move and two different schools for

11

Taylor. She did not specifically mention Moog. Carrie C. did not state to Bieller that the Parents were expecting the District to pay for either of the two schools under consideration.

On August 26, 2004, the Parents enrolled Taylor at Moog in St. Louis. Prior to that date, the parents did not notify Amy Jackson or anyone at the District that they were going to place Taylor at Moog. As of that date, the Parents did not know what the District had to offer Taylor, and had not made contract with the District to see what it could offer or whether it was willing to contract with Moog. At the hearing, Chris P. acknowledged that he and his wife received copies of the IDEA procedural safeguards from the District and were capable of reading and understanding those safeguards. He only skimmed those safeguards until after an IEP meeting in November 2004. Although he received the safeguards prior to Taylor's enrollment at Moog, he did not inform the District that he was going to place her at Moog and did not, prior to placing her at Moog and within ten business days of that enrollment, notify the District in writing that he was going to place her there and seek reimbursement for that placement.

The Moog Center for Deaf Education is a not-for-profit private school located in St. Louis, Missouri, about 150 miles from Poplar Bluff and serves only hearing impaired and deaf children between the ages of birth to nine. No nondisabled children attend Moog. Moog is an approved private agency by the Missouri Department of Elementary and Secondary Education and, thus, public schools are permitted to contract with Moog for a child's education. At the time of the hearing, Moog had approximately 35 children in its 3-9 year-old program and 25 children in the birth to three program. Of those children, only ten

12

were placed through public school contracts with the rest parentally placed. Approximately 75% of Moog students have cochlear implants and the rest have hearing aids. Moog was built for hearing impaired children and steps have been taken to avoid static electricity. Recess, though, is outside where the acoustical environment cannot be controlled. During recess, students wear their hearing devices and are able to effectively communicate with one another. Although Moog employs speech-language pathologists, only about eight students receive their speech-language services through those pathologists. The rest receive their speech services through the classroom teachers.

Moog espouses a philosophy of auditory/oral education for hearing impaired and deaf children so that such children learn to speak and to understand the speech of others. The focus of the program is to teach deaf and hearing impaired children spoken language. Moog offers an intensive individualized program where the focus is on oral communication and providing deaf children the opportunity to learn to speak and to understand the speech of others commensurate with that of their typical peers. Most of the staff has been trained in teaching deaf children to talk and most have masters of education degrees in hearing impairment. All of the classroom teachers are certified by the State of Missouri in deaf education and many have a great deal of training and experience with oral deaf children using cochlear implants. Moog also has three audiologists on staff who are responsible for ensuring that the students' hearing devices are working properly.

According to Moog staff at the hearing, children with hearing impairments do not acquire language the same as do their typical peers. Rather, normal children absorb language

simply by being in the world and by talking, whereas hearing impaired children need direct instruction to learn to speak and to listen through whatever device they have. Moog staff testified they wanted their students' language to be commensurate with their normal hearing peers when they mainstream. Mainstreaming generally was defined by Moog to mean a regular education classroom. Moog does encourage their students to participate in outside activities with typical peers.

Moog prepares what it describes as "IEPs" for the children who are parentally placed, acknowledging those IEPs may not be consistent with IDEA requirements. The Moog IEPs consist of assessment forms and checklists such as the TASL (Teacher Assessment of Spoken Language), the TASSK (Teacher Assessment of Speech Skills) and the Jump Start: An Accelerated Approach for Auditory Training. Each IEP contains these same assessment forms. Moog individualizes the forms by marking appropriate boxes to indicate which standard goals will be worked on for that particular child and/or which goals have been attained. The Moog IEPs are accompanied by a manual to determine the criteria and how to assess whether those criteria have been met.

Children in Moog's 3-9 year old program generally follow the same basic daily schedule that includes speech, auditory training, language, reading, math, choice time, recess, some science and/or social studies, and physical education. Each class period is 30 minutes in length and the class sizes range from one child to 9 to 10. Jean Moog, founder of the Moog Center, testified that no research exists that compares the rates of progress of children who attended oral private schools such as Moog and those hearing impaired/deaf students

14

who attended public school programs. Jean Moog and Christine Gustus, principal of Moog, testified that they are aware that within the deaf education profession there is criticism of the Moog-type methodology and program.

At the time of her enrollment at Moog, Taylor and her father, Chris P., began residing in St. Louis, Missouri, during the school week. They would leave Poplar Bluff on Monday mornings at around 5:30 a.m., spend the week together in St. Louis, and return to Poplar Bluff on Friday afternoons. As a result of this relocation to St. Louis, Taylor and her father were apart from Taylor's mother and her siblings and that was difficult for them. At times, Chris P.'s work required him to travel during the week, at which times Taylor stayed with her grandparents or another individual stayed with her in St. Louis. Due to their increased time together, Chris P. was able to simulate some of Moog's methods at home, benefitting Taylor.

On August 27, 2004, Amy Jackson's secretary received a call from Chris P., which Jackson returned the following Monday, August 30. During that conversation, Chris P. informed Jackson that Taylor was attending Moog and he asked if the District would contract with Moog. Jackson informed Chris P. that Taylor's IEP team would have to convene to consider his request for a change of placement and asked if he would like the District to schedule an IEP meeting. After Chris P. indicated he would like a meeting, Jackson informed him that the District would send him a meeting notification.

At the time of the hearing, the District had seven hearing impaired students and one deaf student attending, none of whom had a cochlear implant. The District also has no

defined "deaf education" program. The District views each hearing impaired or deaf child individually and, based on evaluation information, each student's IEP team develops an IEP that includes the services necessary for that student, including what the least restrictive environment for that student might be. At the time of the hearing, each of the District's hearing impaired or deaf students was being mainstreamed or included in regular education to some extent. Jackson testified that her understanding of IDEA's free appropriate public education (FAPE) requires education to be provided in the least restrictive environment. District staff testified that after the District learned of Taylor's hearing impairment, the District began preparing its staff to address her needs, sending various staff members to workshops and trainings. The District even discussed the possibility of reviewing acoustical concerns and minimizing noise, and also discussed the possibility of contracting with an outside person to give recommendations if necessary.

On August 30 and September 3, 2004, Moog completed an educational evaluation of Taylor, which was provided to the District on September 17, 2004. The evaluation included assessment of Taylor's receptive language (the language a child comprehends) and her expressive language (the language a child produces). On the Clinical Evaluation of Language Fundamentals-Preschool (CELF), Taylor scored within the average range on two of the three subtests administered to evaluate her Performance IQ measuring her overall nonverbal cognitive abilities. However, her Verbal IQ subtests indicated her overall verbal cognitive abilities were below the average range compared to normal children. At the conclusion of the report, the authors, including Christine Gustus, made recommendations for

Taylor's education, one of which was that Taylor receive daily speech instruction from a speech-language pathologist (SLP). During the time Taylor had attended Moog, though, she did not receive such instruction. Gustus, the Moog principal, testified that after enrollment, with consultation from an SLP, she determined that Taylor's apraxia diagnosis was not as severe as indicated in the report and that daily SLP services were unnecessary.

C.    The November 22, 2004 IEP

On September 9, 2004, Amy Jackson sent Chris P. a notification to his Poplar Bluff address for an IEP meeting to be held September 24, 2004. The notification indicated that the purpose of the meeting was to consider a parent request for a change of placement, to develop an IEP, if necessary, to review any existing data and to discuss a reevaluation. On September 24, 2004, Taylor's IEP met to consider the Parent's request for a change of placement to Moog. Neither Chris P. or Carrie C. showed up and, as a result, the team adjourned. After the meeting, Jackson attempted to get in touch with Chris P., leaving messages for both parents asking if they wished to reschedule the meeting. Chris P. subsequently contacted Jackson, explaining that his wife had failed to forward the meeting notification to him in St. Louis. He then provided Jackson with his St. Louis address, requesting future meeting notifications be sent there. He also requested to participate in future meetings by telephone. Jackson then sent a second meeting notification for a meeting on October 11, 2003, and included another copy of the IDEA procedural safeguards.

On October 11, 2004, Taylor's IEP team met, with Chris P. and Moog staff participating by telephone. The District staff that participated where Bieller, Jackson,

Christy Smith and Jeanine Bradley. The Moog staff participated in the meeting and were given the opportunity to ask questions and have input. The District proposed a reevaluation because of Taylor's now diagnosed hearing impairment and the Parent's request for a change to private placement. Chris P. agreed to the reevaluation. The IEP team did not change Taylor's IEP or placement at that time, pending the evaluation. The team also did not agree to a change in placement because Taylor was still diagnosed for IEP purposes as YCDD and not a child with a hearing impairment. The District also did not believe Moog to be Taylor's least restrictive environment. At the hearing, Jackson testified that the District did offer to provide services to Taylor pending the reevaluation period. Chris P. indicated he would bring Taylor back only for the reevaluation testing.

In October 2004, Taylor suffered another loss of hearing in her right ear. The audiological evaluation where this additional loss was discovered was the result of Chris P.'s awareness of a change in Taylor. In response, Moog contacted Dr. Randall Clary who determined Taylor was a candidate for cochlear implant surgery. The Parents believed a cochlear implant and oral education were important; therefore, they agreed to the surgery, which was scheduled for January 2005. Although Taylor had been attending Moog since August of 2004, Moog did not develop a Moog IEP for her until October 14, 2004. Chris P., Mary Shortal (the Moog coordinator) and Becky Durrell (one of Taylor's Moog teachers) participated in the meeting.

During October and November 2004, the District conducted its reevaluation and Taylor wore her hearing aid during the testing. Jeanine Bradley, SLP, tested Taylor in the

18

speech-language area, observing little or no change in Taylor's speech-language skills from the last time she had seen her in May. Christy Smith administered the Weschsler Individual Achievement Test-II (WIAT) to assess Taylor's academic achievement. On the WIAT, the standard scores have a mean of 100 with a standard deviation of 15. Taylor achieved a standard score of 108 in word reading, a 94 in mathematics reasoning, an 85 in spelling, a 91in listening comprehension,[2] and a 94 in oral expression. The only score that was more than one standard deviation below the mean was in numerical operations. Thus, the test reflected average performance in all areas except numerical operations.

On November 10, 2004, the District provided the Parents with a meeting notification for a meeting scheduled for November 22, 2004. The notification informed parents that the purpose of the meeting was to discuss the reevaluation, to consider a change of placement, and to develop an IEP for Taylor if necessary. Prior to that meeting and with Chris P.'s permission, the District requested and received a copy of the Moog IEP. Amy Jackson testified at the hearing that in so requesting, the District was hoping to obtain information that would assist the team in the development of Taylor's IEP and programming. In Jackson's opinion, the Moog IEP was not IDEA compliant because it lacked specificity about where Taylor was functioning "as far as each area in the development of the goals, etc."

---

[2] The listening comprehension component of the WIAT is administered verbally, incorporates receptive language ability, and requires the student to have some auditory skills. The oral expression subtest involves the ability to express wants and needs through verbal or oral answers.

19

On November 22, 2004, the District's IEP team met to discuss the reevaluation results and to discuss a new IEP for Taylor. At that time, Taylor had not had cochlear implant surgery. Chris P. and members of the Moog Staff participated by telephone. The participants included: Christy Smith, Jeanine Bradley, Amy Jackson, Berla Bieller, Debbie Harper, Chris P., Mary Shortal, Christine Gustus, and Jean Moog. The District kept and maintained written meeting notes. Initially, the team discussed the reevaluation. There was also some discussion of the IQ test that Moog administered and the interpretation of those scores. After a review of all testing, the team agreed that Taylor's new IDEA education diagnosis should include hearing impaired/deafness, sound system disorder and language impairment.

The team proceeded to develop a new IEP. During that part of the meeting, the meeting notes reflect that District staff raised the fact that Taylor was not just a hearing impaired student and that her IEP needed to address other delays that were present before and after she became hearing impaired. The team had some disagreement with respect to the goals and objectives to be included in the IEP. Christine Gustus believed that the District's goals showed a lack of experience with young hearing impaired students with hearing aids. She testified at the hearing that she believed the focus of the District's goals were inappropriately on academics and not on the language associated with academics. According to Gustus, after Taylor's hearing loss, she did not have access to high frequency sounds and they would have been targeted sounds to work on during speech class prior to the cochlear implant; however, if the sounds come up in language, Moog tells the student that the sounds

20

are there and models them so the student can imitate the sounds. Gustus also disagreed with the extent of the oral-motor practice goal, Taylor's responsibility for the hearing aid (believing Taylor was too young), limitations of the receptive language goals, and the apparent confusion of the District between phonemic awareness through reading and the auditory or listening goals (in response to Moog's concerns, this goal was revised). Overall, Gustus believed that the language objectives and goals were limiting and if only that much progress was made, Taylor would never catch up with normal hearing peers. At the administrative hearing, Gustus said she would rather not go into her understanding of IDEA's FAPE requirement and said she could not answer questions about whether her critique of the IEP was based on a FAPE standard, although she did acknowledge that FAPE was not the equivalent of teaching a deaf child to learn to speak. During the November IEP discussion, District staff stated they would be willing to accept recommendations from Moog as they had not seen Taylor in some time. While Moog staff expressed a willingness to fax additional goals after the meeting, Gustus subsequently sent a fax to Amy Jackson declining to do so.

The November 22, 2004, IEP includes goals and objectives that address Taylor's deficits that resulted from each of her IDEA disabilities. Those goals address preacademics, oral motor for speech production, articulation/speech, awareness and responsibility for hearing aid, receptive language, expressive language, morphology, math, reading, writing and audition. The November 22, 2004, IEP contains a present level of performance and a list of accommodations for regular education. The IEP also includes transportation as a related service, an FM system or auditory trainer, four audiological checks per year, and a

21

full-time facilitator to assist Taylor.  The IEP proposes a placement of a full-day kindergarten program,[3] with 30 minutes per day of specialized instruction in math, 30 minutes per day of specialized instruction in reading, and 60 minutes per day of one-on-one or small-group instruction in speech/audition and language in a special education setting.  As part of the District's attempt to form a least restrictive environment, Taylor was to spend 35% of the school day in special education and 65% of the day in regular education with supports, accommodations and modifications.  Although the team did consider the Parents' proposed placement, the team rejected Moog because the District staff believed the placement was too restrictive.  The IEP does not include the names of implementers or the individuals who would provide services to Taylor.  At the conclusion of the meeting, Chris P. told the team that he disagreed with the proposed placement and asked about his options.  He was informed about his rights pursuant to the procedural safeguards.

In November 2004, although the team members were aware that Taylor would be receiving a cochlear implant, she had not yet had the surgery.  Because the team did not know what Taylor's auditory discrimination or speech perception would be after the implant, the team agreed in November to reconvene after Taylor's surgery to review and, if necessary, revise the IEP.  Chris P. and the Moog staff participated in the development of Taylor's November IEP.  District staff specifically sought input from Moog and components of the

---

[3]The district proposed a full-day kindergarten placement in the November IEP because Moog was treating Taylor as a kindergarten student; however, the district had originally intended to keep Taylor in the early childhood program at the Parents' request.

IEP were modified at Moog's request. Although the sole purpose of the IEP was not to teach spoken language to Taylor, that purpose was incorporated into the IEP. By the conclusion of the meeting there was a consensus regarding the present level and the goals and objectives of the IEP.

In a letter dated November 22, 2004, to Amy Jackson, Chris P. outlined his reasons for rejecting the November 22, 2004 IEP. Chris P. stated he was rejecting the IEP because: Taylor's hearing issues require a specially trained team not available at the District; the IEP includes goals that ignore the limitations of the hearing loss; Taylor's IQ assessment showed a lack of understanding of the use of the test for deaf children; the IEP goals ignored the need for continuous integrated speech and language; audiology services are not available in Poplar Bluff to manage sudden hearing changes, equipment maintenance and other acute audiology needs; the District and local audiologists did not understand cochlear implants and their management; and the District refused to consider the impact of the scheduled (but not yet performed) cochlear implant surgery.

At the hearing, Jeanine Bradley, who had participated in the November meeting, testified that the November 2004 IEP was appropriate for Taylor based on the information the team had and she believed that had Taylor returned to the District to receive the proposed services, she would have received educational benefit. Bradley also testified that she agreed with the full-day kindergarten placement and the time in regular education because Taylor had good conversational skills with those with whom she felt comfortable and, in her opinion, could reach that comfort level in a kindergarten class. In her opinion, Taylor would

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 23 of 81

have good peer role models for speech and language in that setting. Other District staff testified that they believed the proposed IEP offered Taylor FAPE in the least restrictive environment. The District staff also testified that all the information presented, including the Moog information, was considered in making the placement decision.

Kindergarten students in the District are housed in a separate kindergarten building where there are approximately 15 to 20 regular education classrooms. At the kindergarten level, the District has assigned one speech-language pathologist and one speech implementer to serve those students' special education needs. In each elementary building, the District has two speech-language pathologists assigned to deliver services. The District does not determine which teachers or therapists will work with which child until the beginning of the school year. Jackson testified that her understanding of the IDEA is that the District is not required to indicate (and does not) the specific person who will be delivering IEP services to a student.

Debbie Harper was one of several kindergarten teachers who might have been designated as Taylor's kindergarten teacher had Taylor returned to the District during the 2004-2005 school year. Harper has twenty years' experience in teaching and has a bachelor's degree in elementary education, hours towards a master's degree in reading and is certified by the state of Missouri to teach elementary education. Although she is not certified in special education, she has taken some courses and attended workshops on educating children with hearing impairments. Harper has had children with disabilities, including hearing impairments, in her regular education classrooms. In her opinion, she is

24

able to appropriately address the needs of the special services students assigned to her classroom even without certification in that area. During any given year, Harper has 17 to 24 students in her kindergarten classroom and typically has a part-time teacher's aide to assist her. During the 2005-2006 school year, she had 24 students total, four of them with IEPs. In the last two years, she has had students in her regular education classroom who had personal aides and Harper was able to instruct those students with the aides present.

Harper testified that a kindergarten classroom generally includes students with a range of ability levels and language skills, but that she is able to effectively instruct the group by such techniques as rephrasing, asking for repetition, and being a good language role model. Harper testified that in her classroom the focus throughout the day is on language acquisition and her schedule is arranged in such a way that she is able to spend one-on-one time with any child who requires that. Harper attended IEP meetings for Taylor even though she had not met or taught her. Harper has used an FM system for a student in the past and was willing to use one with Taylor. Harper testified that she had no concerns about Taylor's ability to participate in her classroom activities.

Sharon Burkey is the speech-language pathologist assigned to work with kindergarten-aged students and she testified for the District. Burkey has a master's degree in communication disorders and holds a certificate of clinical competence. She is also certified by the state of Missouri to serve as a school-based speech-language pathologist. At the time of the hearing, Burkey had four years' experience in the public schools. During her undergraduate and graduate education, she had training on educating children with hearing

25

impairments. Burkey has also attended workshops on educating students with cochlear implants. During her four years of professional experience, she has worked with children with hearing impairments who are oral, but she has not worked with a child with a cochlear implant. However, Burkey believes that her training and experience qualify her to provide therapy to a hearing impaired child with an implant.

Burkey explained that a hearing impaired child's experience determines how that student acquires language. Because the most important time in language acquisition is from 18 months to two years of age, a hearing loss during that stage can be very detrimental to language development. In contrast, if a child loses hearing at a later age, the child may have already acquired a large part of her language, and the impact of the hearing loss on language acquisition might be less detrimental. When a hearing impaired child has access to sound through a hearing aid or cochlear implant, that factor also will impact the student's educational program. In Burkey's opinion, it is important for hearing impaired children to have typical children as speech and language role models and for imitation and socialization. As a result, she believes that some time in a regular education would benefit Taylor's language. Although teachers are better language models for hearing impaired students because they give a correct model, other students can assist in expanding a hearing impaired student's language. Because Taylor's receptive language is within the broad average range, Burkey testified at the hearing that she had no concerns about, and agreed with, the IEP's proposed placements. In her opinion, a Moog placement would have been too restrictive because it would not have provided Taylor an opportunity to be with normal hearing peers

26

while there.  Had Taylor returned to the District, Burkey would have provided therapy for speech, language and audition.

On November 23, 2004, Christine Gustus, from Moog, faxed Amy Jackson a note indicating that Moog "will not be sending additional language goals at this time."  That same day, Chris P. filed for an IDEA due process hearing by writing to the Missouri Department of Elementary and Secondary Education.  In that request, Chris P. stated that the nature of the problem was "inappropriate evaluation of a deaf child and improper/substandard education plant" and he proposed a change of services to Moog as the resolution.  The form that he completed does not indicate that he did not understand the services being offered by the District, that the placement offered and described by the November IEP was too vague, or that he was seeking reimbursement for Moog.  Moreover, Chris P. did not file with respect to the subsequently developed March 2005 IEP.

On December 2, 2004, the District sent Chris P. a copy of the November 2004 IEP and a written notice of action refusing the requested change of placement to Moog.  In addition, the District sent a notice of action refusing to revise Taylor's IEP to address her cochlear implant needs since the request was premature.  That notice indicated that the team would reconvene after her implant surgery to address what revisions, if any, to the IEP might be necessary.  On December 3, 2004, the Missouri Department of Elementary and Secondary Education appointed a three-member panel, consisting of Janet Baker, Esq., Dr. Betty Chong and Dr. Gale Rice, to hear the Parents' due process case.  On December 20, 2004, Chris P. requested an extension of the IDEA statutory timeline due to Taylor's pending cochlear

27

implant surgery. Chairperson Baker granted the request and extended the time for decision to February 6, 2005.

### D. The March 2, 2005 IEP

In January 2005, Angela Turner began working for the District as a certified teacher for the deaf. Since that time she has worked with each of the District's hearing impaired/deaf students in some capacity and has been well received by those students and their parents. As a hearing impaired and oral adult herself, Turner has served as a role model for those children. Amy Jackson observed Turner in the classroom, noting that her speech was intelligible and that she never received a complaint that Turner's speech was unintelligible. At the hearing, Jackson testified that it was never the District's intent to have Turner be the sole implementer of Taylor's IEP goals. Rather, Turner's primary responsibility would have been to work with Taylor on academics and to co-implement her speech, language and audition goals. Jackson testified she had no concerns about Turner working with Taylor and that the benefits of that relationship outweighed any limitations, if any, which might have existed.

On January 10, 2005, at the age of five, Taylor had cochlear implant surgery with Dr. Randall Clary on her left ear. A cochlear implant is a surgically implanted device. The surgeon places an electrode array into the cochlea that allows for an electrical current to be delivered to an area of the internal inner ear to stimulate the remaining neural elements of the ear that are viable and allows a child to perceive sounds. The implant is initially stimulated three to four weeks after the surgery. At that time, the audiologist gives the child the

28

necessary external equipment and fits it to the child. The audiologist also creates a "map" that contains all the parameters that will allow the child to hear with the implant.

On January 11, 2005, Chris P. corresponded with the District and requested an IEP meeting for Taylor subsequent to her surgery. Upon receipt of the letter, Jackson called Chris P. and asked to have the meeting at Moog so that the District team could look at the school. At the hearing, Moog staff testified they were unaware that the meeting was to be an IEP meeting, and Chris P. testified that the fact that it was an IEP meeting had bypassed him. However, he acknowledged that he had just corresponded with Jackson to ensure that another IEP meeting was scheduled.

On January 21, 2005, the District provided Chris P. with written meeting notification for the meeting on January 24. The notification indicated that the IEP meeting would be held at Moog with the following purposes indicated: to review Taylor's IEP, to consider a change of placement at the Parents' request, to develop an IEP, and to discuss the status of the cochlear implant and its programming implications. Chris P. received the notification but did not explain to Moog that it was to be an IEP meeting. On January 24, 2005, Taylor's IEP team met at Moog to conduct its IEP meeting. Initially, Moog staff took District staff on a tour of the facility. The tour lasted approximately 30 to 40 minutes and District staff had an opportunity to observe Taylor working with a teacher. At the hearing, District staff testified that the strategies that Moog teachers used were similar to those used by Poplar Bluff staff. Jackson testified that, based on that observation, she had no concerns about the District's ability to provide Taylor with a FAPE.

29

The District's meeting notes from the January meeting reflect that the following were among those who participated: Jean Moog, Christine Gustus, Mary Shortal, Angela Turner, Christy Smith, Berla Bieller, Jeanine Bradley, Chris P., Amy Jackson, Debbie Harper and Teri Goldman. At the time, Taylor's cochlear implant, although surgically implanted, had not been initially activated or turned on. The team, therefore, discussed the possible need to revise Taylor's audition goals after her initial activation/mapping, but agreed that it was premature to revise the IEP until that occurred. Jackson informed the team that it would reconvene after the initial mapping and also stated that the District would need to rely on Moog to help develop a new present level of performance because Taylor was not attending school in the District. Jackson also stated that although Moog had a good program, the District was obligated to look at least restrictive environment considerations.

On January 31, 2005, the District sent Chris P. a meeting notification for an additional IEP meeting for February 22, 2005, to review and revise Taylor's IEP and to consider a change of placement. On February 4, 2005, Chris P. informed the District by letter that he had a conflict with that date. On February 23, 2005, the District sent him a written meeting notification for an IEP meeting to be held on March 2, 2005. On February 28, 2005, Chris P. telephoned Jackson to discuss what Angela Turner's role would be in Taylor's educational program. During that discussion, Jackson explained that it was an IEP team decision, but she anticipated that Turner would work with Taylor on audition and in conjunction with Taylor's regular education and special education teachers, as well as the speech-language pathologist.

30

On March 2, Taylor's IEP team met again. The following individuals participated: Jean Moog, Christine Gustus, Mary Shortal, Becky Durrell, Beth Holstad, Angela Turner, Christy Smith, Amy Jackson and Chris P. Chris P. and the Moog staff participated by telephone. When the team first convened, none of Taylor's Moog classroom teachers were present and the District requested their participation. Moog agreed to bring some of those teachers to the meeting. No speech-language pathologist was present as an SLP was not working with Taylor at the time. As the group began to develop the present level of educational performance (PLEP) section of the IEP, Jackson stated that the school team would have to rely on the Moog staff since Taylor was not present in the District and they had not had an opportunity to work with her. At various points during the meeting, District staff indicated the need for data from Moog to develop the IEP. Moog staff, however, did not believe the District would understand their data. It is unclear whether there was a consensus reached with respect to Taylor's IEP goals and objectives, but there was clearly no consensus on placement.

At the meeting, the team updated and developed a new IEP for Taylor. Chris P. and Moog staff were active participants in the development of the IEP. The March IEP includes annual goals and objectives in the following areas: speech articulation, expressive language, academics, math, reading, letters and auditory training. The team reached consensus with respect to the present level of performance and the goals. The IEP proposes services of 30 minutes per day of special education in math and reading in the special education or regular education classroom and an additional zero to 60 minutes per day of specialized instruction

in math and reading in the regular education classroom. Jackson testified that a range of minutes was an appropriate description of services under state and federal law. The range allowed for the provision of services in the least restrictive environment; if Taylor needed more special education services, those could be provided or if she was capable, she could access the regular classroom without the additional specialized instruction.

The IEP further proposed 60 minutes per day of speech/language and audition therapy in a "pull-out" program. The IEP includes references to supplementary aides and services, including an auditory trainer or FM system, and a one-to-one facilitator (aide) who would go with Taylor to all settings. The IEP proposes three daily cochlear implant checks by staff and four District funded audiological checks per year. The IEP further proposes transportation as a related service and extended school year services, as well as provides for physical education in a mainstreamed environment. Environmental issues and supports for school personnel were specified on Alternate Form I. A continuum of placements was recited as being considered, including private placement. The placement proposed was for full-day kindergarten with Taylor spending 35% of the school day in special education and 65% of the day in regular education with supports, accommodations and modifications. Although the District had not yet worked with Taylor as hearing impaired and did not know what would result in the least restrictive environment, District witnesses testified they believed the March 2005 IEP would provide FAPE to Taylor. The March IEP was designed to serve Taylor through the end of kindergarten and was not intended to be for the 2005-2006 school year.

Chris P. testified at the hearing that he believed that the District never really considered placing Taylor at Moog and he disagreed with the proposed placement. He also testified, "They both had different philosophies about how to teach an oral deaf child." On March 4, 2005, Chris P. requested an additional sixty day extension of the statutory timeline for the due process hearing so that he could secure legal counsel. On March 4, 2005, the District's legal counsel told Chairperson Baker that she was not opposed to the request. The District's legal counsel also stated she had not heard from the Parents' attorney. An extension was granted on March 7, 2005.

On March 5, 2005, the District's legal counsel again contacted Chairperson Baker, indicating she had not heard from the Parents' attorney and that the District believed the case needed to be heard as soon as possible. On March 26, 2005, Chairperson Baker corresponded with Chris P. to see if he had obtained legal counsel. On March 29, 2005, the District requested the case be scheduled for hearing in July 2005. On March 30, 2005, Chris P. informed Baker that he had obtained legal representation, and on April 14, 2005, the Parents' attorney contacted Baker to discuss hearing dates.

On April 1, 2005, Amy Jackson left a message for Mary Shortal at Moog and asked her to fax the articulation sounds that Taylor could say. On April 6, 2005, Shortal corresponded with Jackson, stating she would be unable to forward the information at Chris P.'s request. On April 8, 2005, the District provided the Parents with a written notice of action again refusing the requested Moog placement. The notice indicated Taylor could

33

make meaningful education progress in a lesser restrictive environment in the District's proposed placement.

### E. Due Process Administrative Hearing

On May 5, 2005, the Parents' attorney corresponded with Chairperson Baker, requesting an additional extension of the statutory timeline through August 31, 2005. The request was granted on May 9, 2005. On May 19, 2005, the District's attorney corresponded with Chairperson Baker expressing her displeasure that the hearing remained unscheduled, stating, "The District's position is that the [Parents] have unduly protracted this litigation from its inception and their refusal to commit to the tentative July hearing dates is further unreasonable delay." On May 23, 2005, the Parents' attorney indicated he was available for a hearing in September 2005. On June 1, 2005, a hearing was scheduled for September 6-9, 2005. On August 18, the Parents requested a postponement of the September hearing dates, which the District opposed. The panel granted the extension, and at the Parents' request, a hearing was rescheduled for January 23-27, 2006. On November 28, 2005, Dr. Patty Smith replaced Dr. Betty Chong as a panel member.

On December 30, 2005, the Parents' legal counsel for the first time filed a statement of issues to be addressed at the hearing. The issues raised prior to the hearing were as follows:

    (a)    Whether the District made numerous procedural errors and acted in bad faith when describing proposed education placement to the parents, which amount to a violation of Taylor's free and appropriate public education;

Case 2:06-cv-04254-NKL    Document 66    Filed 10/03/07    Page 34 of 81

(b)    Whether the IEP and educational placement proposed for Taylor for the 2004-05 school year is reasonably calculated to provide her with a free appropriate public education;

(c)    Whether the IEP and educational placement proposed for Taylor for the 2005-06 school year is reasonably calculated to provide her with FAPE; and

(d)    Whether Taylor's placement at the Moog Oral Center for Deafness is reasonably calculated to provide her with FAPE and meet her complex special education needs.

On January 10, 2006, the District filed a Motion to Dismiss in response to this Statement of Issues, arguing the Parents' case should be dismissed because of their failure to inform the District of their unilateral placement of Taylor at Moog and their intent to seek reimbursement.

A due process hearing was held on January 23-27 and March 27-29, 2006. The Parents, as petitioners, called the following witnesses to testify: Dr. Amy Jackson, Jeanine Bradley, Wray Ann Williams, Christine Gustus, Beth Holstad, Angela Turner, Becky Durrell, Theresa O'Donoghue, Jean Moog, Chris P., and Dr. Mary Ellen Nevins. The District presented its case in chief on March 27-29, 2006 and presented the following witnesses: Berla Bieller, Susan Jenkins, Christy Smith, Deborah Harper, Sharon Burkey, Dr. Amy Jackson, and Dr. Chana Edwards. On rebuttal, the Parents called Mary Shortal and the District called Dr. Jackson.

Both the Parents and the District called Dr. Amy Jackson to testify. Dr. Jackson began attending Taylor's IEP meetings as the local educational agency representative after she received Chris P.'s telephone call on August 30, 2004, requesting the Moog placement. Jackson testified that the District did not refuse the Moog placement because of funding but

35

because it was not the least restrictive environment for Taylor. At the hearing, Jackson testified that she had determined that there was no significant difference in the funding of Taylor's proposed program at the District with the one at Moog. Jackson was present when Dr. Nevins testified for the Parents. In Jackson's opinion, the District had gone beyond what Dr. Nevins recommended in terms of a mainstream placement. Jackson also testified that the District was "most definitely" willing to consider contracting with Moog for some consulting services upon Taylor's return to the District.

The Parents called Jeanine Bradley, the SLP for the early childhood program, to testify. She testified that based on her training as a speech-language pathologist, she was qualified to work with hearing impaired children, including children with cochlear implants. In her opinion, Taylor needed to have a speech-language pathologist working directly with her. Bradley believed Taylor's disabilities can impact her academically and that is why it is necessary for her IEPs to address academics as well as speech and language. In Bradley's opinion, the IEPs developed for Taylor after her hearing impairment were appropriate based on information that the team had at the time and proposed a placement in the least restrictive environment. The District IEPs would permit Taylor to be in a classroom with peers who have no speech and language delays and Taylor would benefit from those students as role models. Bradley did not believe Moog was an appropriate placement because no children without hearing deficits attend there. In her opinion, the Moog IEPs were not sufficiently individualized for Taylor because they were based on checklist information that is used for all Moog students.

36

Next, the Parents called Christine Gustus, the principal at Moog, to testify. She has a bachelor's and master's degree in speech and hearing and is a certified speech-language pathologist. She is certified by the state of Missouri to teach hearing impaired children. All of her experience has been in teaching oral deaf children to talk, but she has never worked as an educator in the public school system or observed in the Poplar Bluff School System. She has not worked directly as a classroom teacher with students with cochlear implants.

Gustus attended the District's IEP meetings for Taylor. In her opinion, it was not beneficial at that time for Taylor to be in a classroom environment with normal hearing peers. According to Gustus, Taylor did not hear well enough to absorb or understand the language that such children produce. In her opinion, Taylor's language skills would have to be in the normal range before she could be placed in regular education. She also believed that the District's IEPs were "much focused on the academic area" and contained too few goals regarding speech and language. She also disagreed with the District's goal that had Taylor learning to care for her hearing aid because she felt Taylor was too young for that responsibility. Although Gustus testified that Taylor could receive "some benefit in another program," she did not believe it was appropriate to mainstream Taylor 65% of the time. Gustus believed that Taylor needed to remain at Moog at least through the completion of the 2005-2006 school year. Further, Gustus acknowledged that different approaches exist with regard to teaching deaf children how to speak, and the Moog curriculum reflects only one of those. She testified that the Moog approach has not worked for all hearing impaired children. Moreover, she testified that there are professionals within the field who disagree with the

Moog approach and she has heard it critiqued for focusing too much on "learning to listen" as opposed to "listening to learn."

Also, the Parents called Beth Holstad to testify. She is employed by Moog as a pediatric audiologist and has been so employed for ten years. Holstad has her certificate of clinical competence in audiology and is medically board certified in audiology with a specialty in cochlear implants. Before her employment at Moog, she was employed by Central Institute for the Deaf. Holstad is not a certified deaf educator. She testified that Moog includes audiological facilities, including two cochlear implant programming rooms, which allow Moog staff to immediately check to see if a device has a problem. She stated that some of the troubleshooting of a cochlear implant can be handled by a nonaudiologist and children with implants can receive their mapping at places other than Moog.

Becky Durrell, a classroom teacher at Moog for eight years, testified on behalf of the Parents. She has a bachelor's degree and a master's degree in reading and is certified in deaf education and regular elementary education. She was trained to teach the oral approach to hearing impaired children, which can be used in a variety of settings, including public schools. Durrell began teaching at Moog immediately after receiving her bachelor's degree, and even though she had only some limited experience working with children with cochlear implants at that time and was still learning, she believed she was qualified to teach children with cochlear implants.

Durrell was Taylor's kindergarten classroom teacher for the 2004-2005 school year, teaching the subjects of language, speech, auditory training, reading and math. According

38

to Durrell, when Taylor began in her class, she had hearing aids in both ears. Taylor's language was delayed, she was behind her peers, she did not use complete sentences, she used some word combination asked questions incompletely, omitted words in her utterances and her word order was confused. Durrell also testified that Moog prepared an initial IEP for Taylor on October 14, 2004. She testified that children who are postlingually deaf (suffering a hearing loss after acquiring language) tend to progress differently because of their exposure to sound and language before the hearing loss. Durrell explained the oral program involves teaching spoken language with techniques such as modeling and imitation, where the instructors model correctly and encourage students to imitate it back. The program uses a lot of repetition where the student practices language repeatedly throughout the day.

Durrell worked with Taylor in math with four other students, one-to-one for two periods of the day, and with one other student in a conversational language class. For the math goals in the IEP, Durrell used a kindergarten curriculum and Taylor was working at a kindergarten level in math. At that time, Durrell had no concerns about Taylor's level of prerequisite skill to participate in that general kindergarten math curriculum. At the hearing she discussed a math lesson plan she used with Taylor's math group, but did not know if a regular education kindergarten teacher would approach the lesson the same way. Durrell stated she did not know if the teaching techniques she described she used at Moog could be used in a public school setting.

When Durrell first began working with Taylor, her language was delayed and her expressive language was more delayed than her receptive language. Initially, Taylor was not

39

outgoing, but used more spoken language with people at Moog after she became familiar with them. According to Durrell, Taylor made progress in language and speech during the year. After the activation of Taylor's cochlear implant, she made progress in audition. Durrell believed that Taylor's progress was specifically related to the teaching at Moog, "because she was receiving what she needed to acquire spoken language; the repetition, the practice, the structured teaching in a small group setting."

Durrell testified that Taylor's language remained delayed and, in her opinion, Taylor was not ready for a regular education classroom because she would have a difficult time following a classroom discussion. She also testified that if Taylor returned to the mainstream, she would need preferential seating, an FM system, and some individualized or small group work where vocabulary could be pre-taught. Still, even with these, Durrell testified that she did not believe Taylor had the language skills to be in a regular classroom for 65% of the time. She needed to have a structured environment for the majority of the day. Durrell did admit there was benefit to both hearing impaired children and nondisabled children to being around each other.

Theresa O'Donoghue testified for the Parents. She is a teacher at Moog in the 3-9 years of age program. She is certified to teach hearing impaired children, and has 23 years of experience with oral deaf children, ten of those years at Moog. O'Donoghue's undergraduate training did not focus on how to teach children with cochlear implants but on how to teach deaf children to talk. She believed she was qualified to teach those children even without specific training in cochlear implants. O'Donoghue was Taylor's beginning

reading and conversational language teacher for the 2004-2005 school year and taught reading and social skills to Taylor during the 2005-2006 school year. She testified she did not know if the type of collaboration that she described existed at Moog between teachers occurred in public schools for IEP students. O'Donoghue's testimony indicated she did not know whether hearing-disabled students would benefit in spending time with nondisabled peers.

O'Donoghue testified she did not know how Taylor's receptive skills compared to those of her nondisabled peers when she first enrolled at Moog. According to O'Donoghue, Taylor made progress in those areas. In her opinion, given Taylor's progress to date, Taylor would learn to talk and communicate with others using spoken words, eventually allowing her to transition back into a mainstream educational setting. However, O'Donoghue did not believe Taylor was currently reading for a mainstream setting for 65% of the school day. She did not believe a one-on-one aide would help because the aide would feel the need to explain the language being presented to Taylor, which would take attention away from the teacher and other classroom events.

Jean Moog, Director of Moog, testified for the Parents as an expert in the field of deaf education. Moog oversees all of the educational and other programs conducted there. She has an undergraduate degree in philosophy, a master's degree in speech and hearing, and is certified in deaf education. Ms. Moog was employed at Central Institute for the Deaf from 1966 to 1996, when she founded the Moog School. She has not been a classroom teacher since 1978, and has no public school experience.

41

At the hearing, Ms. Moog testified that hearing impaired children do not acquire language the same as normal children. According to her, normal hearing children acquire language from birth by hearing it and develop it by hearing others talk. In contrast, deaf children typically need direct instruction to learn how to talk. She testified that birth to three is the best age to teach children how to talk, then up to age six. According to Ms. Moog, if you lack the English language, then you cannot understand the reading as the syntax becomes more complex. Further, she testified that the focus at Moog is on teaching children how to use spoken language. Ms. Moog also testified about Moog's use of the TASL, SPICE and Jump Start as evaluation and curriculum tools, noting that those are produced by Moog and commercially available. She stated that she was unaware of any studies that have looked at the validity of those tools as criterion referenced instruments.

Ms. Moog testified there are approximately 40 private schools such as Moog, although a much larger percentage of students with hearing impairments attend the public schools. She acknowledged that there are probably people in the deaf education field who criticize Moog; she also stated there is no study comparing the progress of children in Moog-type programs and public school settings. Ms. Moog knew Taylor but had not worked with her on a day-to-day basis. She observed Taylor approximately ten times at Moog, and attended three of Taylor's IEP meetings at the Parents' request. In regards to Angela Turner, Ms. Moog testified that if Turner was able to listen well enough through lip reading and hearing, to hear the language spoken by Taylor in order to help Turner improve during reading and math activities, that she would not be concerned about Turner being the service provider.

Ms. Moog did express concern about Turner teaching spoken language skills and correcting speech, but that a speech language pathologist could learn to listen to Taylor and model speech and properly correct Taylor's speech.

Chris P. also testified. He believed that he had been advised of, and had attended, all of Taylor's IEP meetings. He had been allowed to ask questions at the meetings, and also received copies of Taylor's IEPs and evaluation reports. Carrie C. did not attend any meetings. Chris agreed that Taylor's education needs changed during the summer of 2004 and that it was logical for the District to reevaluate her before determining how those needs had changed. He also agreed that the educational implications of hearing loss are not the same for all hearing impaired children. Chris acknowledged that the IEPs developed after Taylor suffered a hearing loss included oral communication as her primary mode of communication. He further conceded that the purpose of the IEP team is not necessarily to agree to what the parent or Moog staff requests, and that there is room for professional disagreement about what may be appropriate for Taylor. However, he testified he did not believe the District ever really considered placing Taylor at Moog and that the District and Moog had different teaching philosophies. He thought the District was not very specific with its proposed program and was vague; he said he did not get enough information to determine what the District's program was and he thought the District was being evasive.

In Chris's opinion, Taylor made progress since she began attending Moog. He understood that Taylor would have teachers other than Angela Turner if she returned to Poplar Bluff and that she would have nondisabled peers who could serve as language role

models.  He stated that his goal was to have Taylor leave Moog by May 2007 but that, in his opinion, she was not currently ready for a mainstream setting.

Dr. Mary Ellen Nevins testified as an expert witness for the Parents in deaf education. Nevins has a bachelor's degree in speech correction and a doctorate with a concentration in the education of hearing impaired children.  She previously taught at Central Institute for the Deaf in St. Louis and Jean Moog was one of her supervisors there.  Nevins is a certified teacher in Missouri but has never taught in a public school setting.  She has focused the large majority of her professional writings on the needs of children with cochlear implants.  Nevins is a "professional development specialist" and has a private practice in which she consults with schools, hospitals and others who work with children with cochlear implants.  In that capacity, she trains people to work with children with hearing impairments in educational environments, including public schools.  Nevins agreed that the vast majority of students with hearing impairments are educated in public schools.  Although Nevins testified that she is familiar with IDEA, she stated that the professional development that she provides is not intended to educate people on how to be complaint with IDEA requirements.

Dr. Nevins is the co-author of a book entitled "Children with Cochlear Implants in the Educational Setting."  She testified that the fundamental principles articulated in that publication remain sound, one of which being that cochlear implant technology supports the trend toward greater inclusion of disabled children with hearing impairments.  She further testified that speech intelligibility is an advantage of mainstream placement, but it would not

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 44 of 81

benefit Taylor because Taylor needs an environment that will help her develop skills she will need to be successful in the mainstream.

Nevins testified there are a number of avenues by which children with hearing impairments can acquire language. Children with hearing impairments who have hearing parents and who are trying to develop spoken language need auditory access. Hearing aids can provide audition and do help children with mild to moderate level hearing losses develop language in a more natural manner. A child with a cochlear implant has even better auditory access so that even a profoundly deaf child now has a better opportunity to learn language in a more natural fashion. But, Nevins explained, "it's not simply a matter of putting the cochlear implant on and forgetting about it and letting the child go and – and accrue language. There needs to be some specialized attention to the systematic development of language, but the task is made much, much easier by the auditory access and the superiority of that access now provided by the cochlear implant."

A mainstreamed classroom will present auditory challenges to such children. Thus, while the cochlear implant provides auditory access, a personal FM system will bring the teachers' voices directly to the child. According to Dr. Nevins, the greatest challenge is academics because the child needs enough language to support him at the time of mainstreaming but needs to continue learning the language. She stated that in her opinion, for the development of speech production, the child is best served by a teacher who has auditory access and standard speech production skills, standard rhythm and melody and who can monitor the child's production of speech as well.

45

Dr. Nevins indicated she was familiar with the IDEA's least restrictive environment requirement, and the need for public schools to offer a continuum of placements, but stated she could not answer more specific questions because it was not her area of expertise. She did define mainstreaming as a setting in which the student has sufficient skills to warrant an independent placement with minimal support services and no instruction by a certified teacher of the deaf, with the exception of some collaborative consultation. She contrasted that definition with her definition of "inclusion," a setting where there is often a "side-by-side educational team, teacher of the deaf, regular educational teacher working together with a group of children" in a regular education classroom. Nevins testified that children with cochlear implants can learn speech by overhearing conversations of their peers and teachers.

Dr. Nevins testified that the focus of the Moog program is to teach children spoken language. She was not familiar with IDEA's requirement to provide children with access to the general curriculum, although she did testify she believed that was important and did not know how the Moog program conformed to the Missouri state curriculum. She testifies that she was unaware of any studies that compared the progress of children in small self-contained oral education classrooms with larger public school programming. She was also unaware of studies that track students in private Moog-type placements for their success in the public school setting.

Dr. Nevins testified Taylor is a deaf, rather than a hearing impaired, student because she has an unaided hearing loss of at least 90 decibels. She also considered Taylor to be

46

prelingually[4] deaf because she did not have language commensurate with her age at the time of the identified hearing loss. Nevins disagreed with those standardized test results that showed that Taylor's receptive language skills were within normal limits, but she did concede that the test scores as stated were within that range. She further stated that a student's receptive language skills have educational implications because "receptive language skills are the cornerstone of subsequent learning" and have a direct correlation with what the child can hear and understand in the classroom. Taylor's expressive output was significantly delayed and the combination of the two, receptive and expressive, caused Nevins to consider Taylor to have significantly delayed language at the time of deafness. The level of a student's auditory access and the level of receptive language are both factors that should be considered in deciding a student's placement.

Nevins testified that an appropriate IEP for Taylor should address her auditory skills, speech intelligibility, and expressive and receptive language and academic areas. She also testified that it is important not to have a "one-size-fits-all" IEP for a hearing impaired child and she stands by the statement in the book she co-authored that school staff needs to be able to provide flexible programming that matches the child's learning styles and capabilities. She further testified that she envisions speech-language pathologists as playing a role in the hearing impaired child's education by providing speech, language and audition therapy.

---

[4]At the hearing Christine Gustus testified that a prelingually deaf child is one who experiences a hearing loss prior to the development of language and a postlingually deaf child is one that had developed some language prior to hearing loss.

In Dr. Nevins's opinion, the District's proposed placement in the November 2004 or March 2005 IEP was not appropriate because Taylor would not have the skills to support continued academic progress in a mainstreamed environment and she would not have the opportunity to improve her spoken language skills in that environment. She also was concerned about the one-to-one aide proposal because "repetition of what the teacher says is not going to develop language." In addition, she had concerns about some of the background knowledge that the personnel in the District had with meeting Taylor's specific needs, but also acknowledged that she did not know what type of skills, training and experience District staff had with respect to cochlear implants and working with children with hearing loss. Nevins testified that in her observations at Moog, Taylor did well in a structured setting, having more difficulty in the unstructured setting. She believes Taylor made progress at Moog as a direct result of the teaching strategies. However, she also stated that many children with hearing impairments and cochlear implants can be successfully served in public schools and one of the purposes of her book was to make recommendations with respect to how that can be done. One of those recommendations is that all care providers collaborate on programming.

The District called Berla Bieller, the District's psychological examiner, to testify. In addition to her testimony cited above, Bieller testified that an IEP that focused exclusively on teaching spoken language to Taylor would not have provided her with FAPE. In her opinion, a child does not require normal or average language skills commensurate with their nondisabled peers to be successful in a regular education environment. Bieller agreed with

48

the placements proposed in the November 2004 District IEP and, in her opinion, Moog was not Taylor's least restrictive environment. Bieller did not participate in the March 2005 IEP meeting.

Christy Smith, District early childhood special education teacher, testified for the District. In addition to the testimony already detailed, Smith testified that she felt free to express her opinion about what was an appropriate placement for Taylor at IEP meetings. Smith is familiar with the District's kindergarten curriculum and believes Taylor could have received FAPE in the kindergarten classroom. In that environment, she should have access to general curriculum and trained professionals, as well as be with nondisabled peers for language and speech. She agreed with the placement proposed in the November 2004 IEP.

Angela Turner was called by the Parents to testify. Turner began her employment in the Poplar Bluff School district in January 2005 as a teacher for the hearing impaired. She has a bachelor's and master's degree in communication science and disorders with an emphasis in deaf education and is certified by the state of Missouri in hearing impairments/deaf education. During her educational program, Turner took courses and gained experience working with children with cochlear implants. Since receiving her degrees, she has taken additional courses on cochlear implants, teaching children with cochlear implants and teaching hearing impaired children how to speak. In her opinion, she is qualified to serve as one of Taylor's teachers should she return to the District.

Angela Turner has profound hearing loss, but her primary mode of communication is oral. At the time of the hearing, she wore a hearing aid and expressed interest in a cochlear

49

implant.  Turner's mother recently received a cochlear implant and she worked with her on

discriminating between vowels and consonants.  Turner understood spoken language through

the use of her hearing aid and through lip reading.  In her opinion, Turner did not agree that

hearing impaired children acquired language differently than normal children.  She testified

that while she was deaf at birth, her family insisted she develop spoken language, even

refusing IEP services for her, although she did receive some speech therapy.  Thus, Turner

believes that with family support, early amplification and the right interventions, students can

develop language that is close to their hearing peers.  She disagrees with the Moog

philosophy that states hearing impaired children should be placed with hearing children only

when they are caught up with those peers.  Turner was not sure she understood the Moog

program fully, but believed it was to build audition skills in language or speech as a primary

focus of the program at the expense of other academic areas.  She testified "that's okay in the

early years, but I think as the child gets older there needs to be – it needs to be in proportion

with the academic studies as well."

     At the time of the hearing, Turner worked with seven of the District's hearing

impaired/deaf students; six of whom were oral and one used sign language to communicate.

Turner worked one-to-one with six of those students on a daily basis.  She provided some of

the services in a regular education setting by "pushing-in."  She also provided some services

by "pulling-out" the student from the regular setting.  She collaborated with the students'

regular education teachers to supplement the academic instruction that was presented in the

regular classroom.  Turner would not feel comfortable working with Taylor on speech

50

because she is not certified in that area and believes that is the speech-language pathologist's job.

Turner testified that she serves as a role model to her students and parents have told her that they were pleased she was working with their children. However, Turner has never met Taylor or had the opportunity to work with her. She has not had the opportunity to implement one of Taylor's IEPs. Turner attended the January and March 2005 IEP meetings. She did not have an interpreter for the January IEP meeting, and believed she was able to follow most of the conversation. She did request an interpreter for the March IEP meeting because Chris P. and the Moog staff participated by telephone. If Taylor returned to the District, Turner anticipated working with Taylor on her audition, math and reading, but not speech.

Susan Jenkins, Director of Special Services for the Salem R-80 School District, testified for the District. The Salem School District is a kindergarten through twelfth-grade public school district with approximately 1,500 total student, approximately 198 with IEPs. Jenkins testified that the Salem District has a developmental preschool and contracts for a speech-language pathologist to work there three days per week. During the time that Jenkins has served as the District's special services director, the district has not employed a teacher who was certified in deaf education and the only individual employed by the district in that time-frame who had children with cochlear implants was a speech-language pathologist. Still, at the time of the hearing, the district was serving three hearing impaired students and one deaf student, and, in the past four years, had educated one student with a cochlear

51

implant. The administrative panel found Jenkins' testimony supportive of the proposition that some hearing impaired children with cochlear implants can be successfully educated in a public school setting, but found her testimony otherwise irrelevant to the needs of Taylor and the District's obligations to Taylor.

Dr. Chana Edwards testified as an expert witness for the District. She has a bachelor's degree in communications, a master's degree in audiology communication sciences and disorders, and a doctorate of audiology. She is certified by the American Speech Language Hearing Association, from which she holds the certificate of clinical competence and is a fellow with the American Academy of Audiology. She is also a licensed hearing instrument specialist. At the time of the hearing, Edwards had been employed for six years as an educational audiologist with the Multi-District Deaf and Hard of Hearing Program (the Program) that is housed within the Blue Springs, Missouri, School District.

The Program is within the greater Kansas City area and contracts with 30 school districts there (Poplar Bluff is not within this area). As an educational audiologist, Edwards provides hearing testing, including full comprehensive audiological and amplification evaluations, and troubleshoots hearing aids. She also teaches school personnel how to work with hearing aids and to do some basic troubleshooting. Edwards also works with dispensing audiologist and cochlear implant centers. In addition, she is a member of IEP teams, advises school districts on topics such as how to acoustically modify their classrooms, and makes recommendations with respect to accommodations, modifications and supports for staff working with hearing impaired children. She has experience working with hearing impaired

children in education environments and estimated that, in the six years she was with the Program, she worked with approximately 400 such children, approximately 50 of which had cochlear implants. The vast majority of the children have been placed in their home schools and, of the 30 districts, only about five had certified teachers of the deaf on staff. Edwards is not a certified deaf education teacher, or a speech-language pathologist, and she has never taught children. She is also not qualified to map a cochlear implant.

Edwards testified that if the child communicates through amplification such as a cochlear implant, uses his audition and does not communicate with sign language, she views that child as hearing impaired rather than deaf. Based on her review of Taylor's audiograms, she would lean toward categorizing Taylor as hearing impaired and an auditory oral communicator. Based on her review of Taylor's records and evidence, Edwards characterized Taylor as perilingually to postlingually deafened. Edwards testified that when a child is exposed to language prior to having a hearing impairment, the child already has the foundation for speech and for language; generally, one can expect those students to progress faster and some different strategies can be used in working with these children compared to those used with children who had hearing impairments since birth or who were never exposed to spoken language. She also stated that in her opinion, it is never appropriate to use the same methods or strategies for all hearing impaired or deaf children.

Furthermore, Edwards testified that if a child is not deaf, the manner in which the child acquires language will depend on the severity of the hearing loss with the vast majority of hearing impaired students whose parents are auditory-oral learning some language

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 53 of 81

incidently, although there will need to be some rehabilitation of the language if they learn it incorrectly.  That can be provided by speech-language pathologists or certified teachers of the deaf.  Based on her review of records, Edwards testified that, up to the point of her hearing loss, Taylor acquired her expressive and receptive language from the auditory oral modality, both incidentally and/or through direct instruction.

Edwards testified that a student with a cochlear implant would not necessarily qualify to receive special education services pursuant to the IDEA and she assists school districts in the process of determining an individual student's eligibility under IDEA.  Of the 400 children she has been involved with through the Program, only about 20 to 25% receive IDEA services.  Factors that are considered in such eligibility decisions include the type of hearing loss, the severity of the loss, when the child was amplified and aided, whether the student's hearing loss occurred prelingually or postlingually and the communication mode.  In Edwards's opinion, a student who has a cochlear implant does not need to have language skills commensurate with their same age peers to receive benefit in a regular classroom or in a public school setting.  In addition, she thought an IEP for Taylor  should have teaching spoken language as a component but should not be the "underlying premises."

During her six years with the Program, Edwards served as a member of teams where the team decision was to propose the use of an outside private program, including auditory oral programs.  She has observed the auditory oral program at Moog.  When looking at whether a student should be placed in such a program, Edwards looked at the age of onset of the hearing loss, the child's linguistic level, articulation and expressive and receptive

54

language skills, home support systems, any outside therapist's recommendations and progress notes. She generally recommended that type of program for a student whose language scores were "very good" – within average limits – as well as evidence of speech and language therapy success. She also looked to see if there was evidence of success using amplification, either through hearing aids or a cochlear implant. In Edwards's opinion, the students who perform best in a Moog-type environment are those who were deafened postlingually and have had a good basis for speech and language. She would recommend placement for such students just for rehabilitation post-implant for the small amount of remediation that needs to occur when a child has suffered form a sudden hearing loss; she would not necessarily recommend an all-day placement in that situation.

At the hearing, Edwards testified with respect to Taylor's August 25, 2005, audiogram, which showed that, in her right ear, Taylor is aided to within the normal hearing range and should be able to detect if somebody was whispering to her using just her right hearing aid. In the left ear (the one with the implant), she was mapped in the 25-30 range, which is normal. Based just on that audiogram, Edwards testified that she thought that Taylor could be successful in the regular education classroom with some modifications and accommodations, but she would have liked more testing to see primarily if an FM system would be of assistance. With the cochlear implant and the hearing aid, the audiograms showed that Taylor had access to normal conversational level speech and could, at that point, have the opportunity to learn language incidentally as well as through direct instruction. Based on her review of records, Taylor's receptive language skills and her audiograms, and

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 55 of 81

considering the least restrictive environment, Edwards testified that her recommendation for Taylor's placement was at the District with accommodations, modifications and supports with some time in a special education environment and with part of her day in a regular education classroom.

In her review and observations of the District's staff, Edwards testified that she might have a minor concern about Angela Turner in speech, but not in academics, language or audition, and the concerns she did have were outweighed by the benefits of Taylor working with Turner. Edwards also believed that a speech-language pathologist who holds a certificate of clinical competence could provide appropriate speech, language and audition therapy to Taylor. In her review of Debbie Harper's teaching, Edwards might have recommended an FM system for Taylor in that classroom during whole group instruction. She also observed Harper using many strategies that she thought were appropriate for a child with a hearing impairment. Edwards testified that Harper's regular education classroom would have been an appropriate placement for Taylor during the 2004-2005 school year.

In Edwards's opinion, Taylor's IEPs, to be appropriate, need to address academics, speech and articulation therapy, language therapy and auditory training. In her opinion, the District's IEPs proposed an appropriate education for Taylor in the least restrictive environment. Edwards also testified that based on her knowledge, the use of a one-on-one facilitation was appropriate for Taylor and, if appropriately trained, would not interfere with Taylor's ability to get instruction from the classroom teacher. Finally, Edwards did not

56

believe the Moog IEP was individualized to Taylor's needs and did not address appropriate academic information and accommodations and modifications to the actual classroom.

### F. Administrative Panel's Decision

On September 18, 2006, the three-member administrative panel held unanimously that the District did not deny FAPE to Taylor by procedural errors and that the District did not act in bad faith when proposing educational placements to the Parents. A two-member majority held that the IEPs for the 2004-2005 school year did provide Taylor with FAPE. Finally, the panel held that the IEP and placement for the 2005-2006 school year was not properly before it.

## II. Discussion

### A. Motions for Judgment on the Administrative Record

#### 1. *Standard of Review*

The IDEA permits aggrieved parties to seek review of an administrative hearing panel's decision by bringing a civil action in federal court. *See Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 654 (8th Cir. 1999) (citing 20 U.S.C. § 1415(i)(2)(A)). In a motion for judgment on the record brought pursuant to the IDEA, a district court must review the state administrative record, hear additional evidence if requested, and grant such relief as it deems appropriate based on the preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(B); *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 636 (8th Cir. 2003). "Although a district court should independently determine whether the child has received a FAPE, it must give 'due weight' to agency decision-making." *CJN*, 323 F.3d

57

at 636.  This standard is less deferential than the substantial evidence test ordinarily applied in federal administrative law cases; however, the district court must give consideration "to the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses."  *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997).  Further, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Bd. of Educ. of  Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).  "This is because, as the *Rowley* court admonished, 'courts lack the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy."'"  *Blackmon*, 198 F.3d at 655 (quoting *Rowley*, 458 U.S. at 208).

<blockquote>2.    *The IDEA*</blockquote>

The IDEA requires a school district that accepts federal funds to provide disabled children within its jurisdiction a "free appropriate public education" (FAPE).  *See* 20 U.S.C. §§ 1400(d)(1)(A), 1412 (a)(1)(A); *see also Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1373 (8th Cir. 1996).  To provide a FAPE, a school must formulate an individualized education plan (IEP) tailored to the disabled child's unique needs.  *See* 20 U.S.C. § 1400(d)(1)(A).  The school district must also provide extended school year (ESY) services if the child's IEP team determines, on an individual basis, the services are necessary to provide a FAPE to the child.  *See id*. § 300.309(a)(2).  The "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense."  *Clynes*, 119 F.3d at 612.  Rather, a school district satisfies its obligations under

58

the IDEA if: (1) it complies with the Act's procedural requirements and (2) the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. An IEP must be evaluated as of the date it is offered; it cannot be evaluated on the basis of facts and circumstances which became known after that date. *See Gill v. Columbia 93 Sch. Dist.*, No. 98-CV-04192, 1999 WL 33486650, at *1 (W.D. Mo. Sept. 2, 1999) (citing *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)).

"One of the Congressional policies behind IDEA is to ensure disabled children to be educated alongside their non-disabled peers rather than to be shut off from them, 20 U.S.C. § 1400, and disabled students are to be educated in a mainstream classroom whenever possible." *Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1034 (8th Cir. 2000) (citing *Rowley*, 458 U.S. at 202; *Clynes*, 119 F.3d at 612). This is embodied in the IDEA's requirement that disabled children be educated in the "least restrictive environment," meaning the disabled student is to be educated with nondisabled students to the "maximum extent appropriate." *Pachl v. Seagren*, 453 F.3d 1064, 1067 (8th Cir. 2006) (citing 20 U.S.C. § 1412(a)(5)). Thus, "a disabled student should be separated from her peers only if the services that make segregated placement superior cannot 'be feasibly provided in a non-segregated setting.'" *Id*. (quoting *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983)); *see also T.F. v. Special Sch. Dist. of St. Louis County*, 449 F.3d 816, 820 (8th Cir. 2006) (noting IDEA reflects "strong preference" that disabled children attend regular classes with nondisabled children and presumption in favor of public school placement). The Eighth Circuit explains that the mainstreaming requirement "is inapplicable where education in a

59

mainstream environment 'cannot be achieved *satisfactorily*.'" *Pachl*, 453 F.3d at 1068. Segregating a child from the mainstream setting is allowed when "'the handicapped child would not benefit from mainstreaming,' when 'any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting,' and when 'the handicapped child is a disruptive force in the non-segregated setting.'" *Id.* (quoting *Roncker*, 700 F.2d at 1063).

3.     *The District's IEPs for Taylor Provided Her FAPE During the 2004-2005 School Year*

a.     *The Parents' Procedural Rights Were Not Denied*

Count I of the Parents' Complaint [Doc. # 1] alleges the District denied the Parents' procedural rights depriving them of meaningful participation in the IEP meetings. In the Parents' Suggestions in Response to the District's Motion for Judgment on the Administrative Record, the Parents state that they "do not substantially contest the School District's compliance with the IDEA's procedural requirements." [Doc. # 49 at 20]. Instead, the Parents argue this claim is actually focused on the District's actions in the summer of 2004, when it was allegedly informed of Taylor's hearing loss (and prior to the November 2004 and March 2005 IEPs), but did not immediately call a meeting to review her IEP. First, this Court notes that Count I of the Parents' Complaint states that it is based on the denial of their procedural rights, specifically with regard to the November 22, 2004 and March 3, 2005 IEP meetings. As it appears the Parents have entirely abandoned this argument in both their Response and their own Motion for Summary Judgment (which makes no mention of the

60

District denying their procedural rights at either IEP meeting), the Court grants summary judgment to all Defendants as to Count I. *See United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051, 1058-59 (W.D. Mo. 2001) (assuming plaintiff abandoned claims not addressed in opposition to defendant's motion for summary judgment).

The Parents' allegation that the District was obligated to immediately convene an IEP meeting, *sua sponte*, as soon as it found out about Taylor's hearing loss is contained in Count II of their Complaint, although that particular count mentions nothing about a violation of procedural rights. However, to the extent that Count II can be construed as a procedural rights violation claim, the Court holds the District did not fail in its IDEA obligations by not calling an IEP meeting. Notably, the Parents fail to cite any statute or case to support their argument and the Court is not aware of any such requirement.

In their Complaint, the Parents cite to the District's failure as a violation of 20 U.S.C. § 1414(d)(4)(A)(ii), which reads:

> The local educational agency shall ensure that, subject to subparagraph (B), the IEP Team—
> . . .
> (ii) revises the IEP as appropriate to address—
>
>> (I) any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate;
>>
>> (II) the results of any reevaluation conducted under this section;
>>
>> (III) information about the child provided to, or by, the parents, as described in subsection (c)(1)(B);
>>
>> (IV) the child's anticipated needs; or

61

(V) other matters.

Nothing in section 1414(d)(4)(A)(ii), or in subsection (c)(1)(B), addresses timing or specifically requires a school district to immediately convene an IEP meeting as soon as it discovers new information. Further, section 1414 does not even contain the procedural safeguards that are located in section 1415. *See also, e.g., Evans v. Dist. No. 17 of Douglas County, Neb.*, 841 F.2d 824, 828 (8th Cir. 1988) (noting section 1415 delineates procedural safeguards).

Moreover, even if this could qualify as a procedural violation claim, Parents fail to present any evidence supporting that the District violated their rights or failed in its obligations. The first time the District may have been put on notice of Taylor's hearing loss was near the end of July 2004, after Chris P. informed Wray Ann Williams of Taylor's hearing loss. Still, he did not discuss specifics with Williams, and even after Taylor was assessed on July 12, she did not return to school with a hearing aid until the very end of the summer program, during the week of August 1, 2004. As the District argues, the mere existence of a hearing aid does not necessarily indicate that a new review is immediately warranted; as far as the District knew, given the information it had at the time, the hearing aid may have allowed Taylor to function properly under the current IEP and her hearing loss would not adversely affect her educational performance. *See Mr. I ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 5 (1st Cir. 2007) (stating to qualify as "child with a disability" under hearing impairment, condition must "adversely affect [] a child's

62

educational performance"). The District simply did not have sufficient information to justify requiring it to immediately convene an IEP meeting.

Also, one of the reasons the District did not have sufficient information regarding the extent of Taylor's hearing loss is because of the Parents themselves. After Taylor was assessed with a hearing loss, the Parents never contacted the District to request a reevaluation or an IEP meeting. Chris P. did not discuss with Williams the details and extent of Taylor's hearing loss. The time between when Taylor showed up to school with a hearing aid (the week of August 1) and when the District contacted the Parents to discuss Taylor's re-enrollment (August 18), only to be informed by the housekeeper that Taylor would no longer be attending Poplar Bluff, was approximately three weeks. During this time, except for the very end of summer school, Taylor was not even attending the District for services.

The District, in this time-period, was never given an opportunity to observe Taylor first hand to determine if her IEP needed to be altered, and the Parents never requested a reevaluation or provided detailed information. Thus, the Court agrees that a three-week delay was not unreasonable; it certainly did not compromise Taylor's right to an appropriate education, hamper the Parents' opportunity to participate in the IEP process or cause a deprivation of Taylor's education benefits, especially in light of the Parents' deliberate choice not to contact the District before enrolling Taylor at Moog. *See Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 563 (8th Cir. 1996). Additionally, Missouri state regulations recognize that reevaluations take time and are not conducted immediately. *See* Mo. Code Regs. Ann. Tit. 5, § 70-742.140 (stating reevaluation may not occur more than once a year

63

without parents and district agreeing otherwise, that district must provide parents with Notice of Intent to Evaluate within 30 days of referral for evaluation (delays permitted for summer breaks), and that evaluation must be completed within 60 days of notice (delays permitted for summer breaks)). Even taking the August 30, 2004, date—when Chris P. requested the District to contract with Moog, and Amy Jackson convinced him to allow the District to conduct an IEP meeting—the District was reasonably within the state regulations' time-line for reevaluations. Therefore, for all the reasons stated above, the Court grants summary judgment to all Defendants as to Count II.

### b. *November 2004 IEP Provided FAPE to Taylor*

The Parents, in their Suggestions in Support of their Motion for Summary Judgment [Doc. # 44], state their problems with the November 2004 IEP included: the teachers selected were not qualified to provide Taylor with the help she needed; the IEP failed to take into account Taylor's condition as a result of her hearing loss by not increasing her speech and language services; the IEP allowed for no input from a teacher of the deaf; there were no goals or objectives for measuring Taylor's hearing improvement; and the IEP did not describe or specify the modifications that were to be made in the educational spaces used for Taylor.

A child receives a free appropriate public education if she "receives personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203. "The standard to judge whether an IEP is appropriate under the IDEA is whether it offers instruction and supportive services

64

reasonably calculated to provide some educational benefit to the student for whom it is designed." *Gill*, 217 F.3d at 1035. As discussed above, the District does not have to maximize Taylor's potential or provide her the best possible education at public expense. *See Clynes*, 119 F.3d at 612. Also, a child's FAPE must be provided in the "least restrictive environment." *See* 20 U.S.C. § 1412(a)(5)(A). "[C]hildren who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day; similarly, children should be provided an education close to their home, and residential placements should be resorted to only if these attempts fail or are plainly untenable." *T.F.*, 449 F.3d at 820 (quoting *Evans*, 841 F.2d at 832).

The November 22, 2004, IEP included goals that addressed preacademics, oral motor for speech production, articulation/speech, awareness and responsibility for hearing aid, receptive language, expressive language, morphology, math, reading, writing and audition. It contains a present level performance and a list of accommodations for regular education, as well as transportation as a related service, an FM system or auditory trainer, four audiological checks per year, and a full-time facilitator to assist Taylor. It proposed a full-day kindergarten placement, with 30 minutes per day of specialized instruction in math, 30 minutes per day of specialized instruction in reading, and 60 minutes per day of one-on-one or small-group instruction in speech/audition and language in a special education setting. In attempting to form a least restrictive environment, the IEP proposed 35% of the school day spent in special education and the remaining 65% in regular education with supports, accommodations and modifications. At the time, Taylor had not had her cochlear implant

65

surgery. Also, it is important to note that Taylor was not in attendance at Poplar Bluff and had not been since the end of summer school. Moog staff and Chris P. fully participated in the meeting where the November IEP was developed.

The Parents' contention that the IEP did not take into account Taylor's condition as a result of her hearing loss is without merit. The IEP clearly has goals focusing on many areas important to children with hearing loss. Further, it provides for an FM system to help her hear better in the classroom and four audiological checks per year. Her speech and language delays continued to be addressed under the November IEP. And while the Parents argue that the November IEP provided for less time in special education than Taylor's previous plans, the November IEP actually increased her time spent in specialized classes to 600 minutes per week, plus assistance provided by a facilitator in the regular classroom. The Court finds that the November IEP, given the facts known at the time, adequately addressed Taylor's condition and provided goals measuring her improvement as it related to her education.

Regarding Parents' assertion that the November IEP was flawed because it did not provide for input from a teacher of the deaf, they point to no statute or case indicating this is an IDEA requirement. Moreover, Moog staff were active participants in the formulation of the IEP, and thus Taylor and the Parents received input to that extent. Finally, the IDEA does not require that Taylor receive the best education possible, only that she receive some educational benefit in the least restrictive environment. The Eighth Circuit dictates that schools do not even have to attempt to maximize a child's potential or "guarantee that the

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 66 of 81

student make any progress at all." *CJN*, 323 F.3d at 642. The IDEA also does not require "the furnishing of every special service necessary to maximize each handicapped child's potential." *Bradley ex rel. Bradley v. Ark. Dep't of Educ.*, 443 F.3d 965, 975 (8th Cir. 2006). While a teacher for the deaf might have made the IEP better, lacking such a provision did not make the IEP inadequate or deficient under the IDEA.

The November IEP also took into consideration modifying Taylor's educational spaces, although the Parents argue it was not specific or detailed enough. The record reflects that these were part of the considerations, were included in the IEP, and had Taylor returned to the school, the District was willing to work on and discuss specific accommodations. Again, greater detail might have been more helpful, but given the information the District had at the time, the IEP as formulated allowed for the greatest flexibility in determining which services and accommodations needed to be implemented once Taylor was back in the District. *See id.* (citing *Clynes*, 119 F.3d at 612).

Finally, the Parents' main contention is that the teachers at Poplar Bluff simply were not qualified to deal with Taylor's situation. To the extent that this argument is based on Taylor's cochlear implant, that surgery had not occurred at the time of the November 2004 IEP and, therefore, the District was not required to consider it at the time because it did not have adequate information, although it did agree to convene another IEP meeting after Taylor's surgery. *Gill*, 1999 WL 33486650, at *1 (stating IEPs must be evaluated on basis of facts and circumstances known as of date offered). Parents agree they never asked to select certain teachers, but they were concerned with the credentials of the teachers the

67

District had identified. "Although the Supreme Court has recognized the importance of parental consultation, and participation in the IEP decision-making process, nothing in the Court's opinions suggest that parents usurp the District's role in selecting its staff to carry out the IEP's provisions." *Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580*, 259 F. Supp. 2d 880, 885 (D. Minn. 2003) (citing *Honig v. Doe*, 484 U.S. 305, 311 (1988); *Rowley*, 458 U.S. at 208).

Parents presented no evidence that the District's staff did not meet Missouri's requirements for teacher qualification. Additionally, as noted by the Fourth Circuit, the IDEA "does not require special education service providers to have every conceivable credential relevant to every child's disability." *Hartmann by Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1004 (4th Cir. 1997) (interpreting *Rowley's* admonition that IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential"). The teachers offered by the District were all certified by the state of Missouri. Several had worked with Taylor previously, and many had gone to relevant workshops and seminars. They had experience in providing special education services. The Parents' main contention is that the District's staff was not as qualified as Moog's; however, this is not an IDEA requirement, and the District retains its right to choose the staff it uses to implement the IEP.

Considering all the factors and the record, the Court believes that the November IEP, given the information known at the time, offered unique services tailored to Taylor's needs. *See T.F.*, 449 F.3d at 821. It provided these unique services in the least restrictive

68

environment, as required by the IDEA.  Thus, the Court holds that the November IEP was reasonably calculated to provide Taylor some educational benefit, and thus was IDEA compliant.  *See also Gill*, 217 F.3d at 1038 (court "must defer to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible"); *Clynes*, 119 F.3d at 614 ("As long as a student is benefitting from his education, it is up to the educators to determine the appropriate methodology.").

### c. March 2005 IEP Provided FAPE to Taylor

The Parents make many of the same contentions in regards to the March 2005 IEP, but state further that Taylor's cochlear implant made her situation even more difficult.  The Parents assert this involved even greater care and specialized knowledge in order to be able to effectively work with Taylor, which, they argue, the District staff lacked.  For many of the same reasons already explained above, which are also incorporated here to the extent they apply, the Court finds the Parents' arguments unpersuasive.

The March 2005 IEP included annual goals and objectives in the following areas: speech articulation, expressive language, academics, math, reading, letters and auditory training.  The team reached consensus with respect to the present level of performance and the goals.  The IEP proposed services of 30 minutes per day of special education in math and reading in the special education or regular education class and an additional 0-60 minutes per day of specialized instruction in math and reading in the regular education classroom.  It also proposed 60 minutes per day of speech/language and audition therapy in a "pull-out"

69

program. The IEP includes references to supplementary aides and services, including an auditory trainer or FM system, and a one-to-one facilitator (aide) who would go with Taylor to all settings. The IEP proposed three daily cochlear implant checks by staff and four District-funded audiological checks per year. The IEP further proposed transportation as a related service and extended school year services, as well as provided for physical education in a mainstreamed environment. A continuum of placements was recited as being considered, including private placement. The placement proposed was for full-day kindergarten with Taylor spending 35% of the school day in special education and the remaining 65% of the day in regular education with supports, accommodations and modifications. The March IEP was intended to serve Taylor through the end of kindergarten and was not intended to be for the 2005-2006 school year. Chris P. and Moog staff fully participated in the meeting regarding the March IEP. In fact, because Taylor was still not attending the Poplar Bluff school district, and had not been since the end of summer school in 2004, the District had to rely on information provided to them by Chris P. and Moog.

The Court disagrees with the Parents' arguments, and their reliance on the dissent to the administrative opinion, that the March 2005 IEP was not reasonably calculated to provide FAPE to Taylor. The March IEP included elements addressing Taylor as a hearing impaired student with a cochlear implant, including audition goals. District staff spoke with Moog staff and even took a tour of Moog to make observations. District staff felt many of the techniques used at Moog were not dissimilar from their own. The March IEP provided for a least restrictive environment, but included provisions for supports to help Taylor in the

70

mainstream environment. Even with mainstreaming, though, Taylor would still spend significant time in the special education classroom. The IEP also provided for an acoustical analysis, important for cochlear implant students, upon Taylor's return to the District. The administrative opinion notes it would have preferred that analysis to have been in place prior to placement, but the Court believes this is adequate, especially in light of Taylor's months-long absence from the District. *See Bradley*, 443 F.3d at 975 (stating IDEA does not require furnishing every special service necessary to maximize child's potential); *Clynes*, 119 F.3d at 614 (stating educators determine appropriate methodology as long as student benefitting from education).

To the extent that the Parents argue that District staff were not qualified to teach a child with cochlear implant, the Court disagrees and adopts the same reasoning it explained above regarding the November 2004 IEP. *See Hartmann*, 118 F.3d at 1004; *Slama*, 259 F. Supp. 2d at 885 (citing *Honig*, 484 U.S. at 311; *Rowley*, 458 U.S. at 208). The teachers were certified by the state of Missouri and qualified to teach. Many had experience with special education students, if not specifically students with cochlear implants. At least one teacher, Angela Turner, did have personal experience with cochlear implant and was oral deaf herself; she could have been an invaluable role model and resource for Taylor. Where Turner could not help, the District was willing to provide services by a speech-language pathologist. The Parents argue the March IEP was not specifically tailored to their daughter's unique needs, but not even all of the experts testifying at the administrative hearing agreed that Taylor could not receive FAPE in the regular classroom. *See T.F.*, 449 F.3d at 821 ("But this is not

71

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 71 of 81

a case where all the experts 'reached the conclusion that a residential placement is necessary in order for [S.F.] to get an education.'").

The March IEP provided a mix of mainstreamed and special education services to the maximum extent appropriate, tailored to the student's unique needs, as required by the IDEA. *See id*. ("The May 2002 IEP offered unique services tailored to S.F.'s needs. That may not have satisfied S.F.'s parents, but it satisfied the requirements of IDEA."). Chris P. and Moog staff participated in the development of the plans and had the opportunity to give input. The fact is the Parents were unwilling to accept any placement but Moog; however, the District, unlike Moog, is required to follow the IDEA and must provide Taylor with an education in the least restrictive environment. *See Blackmon*, 198 F.3d at 658 ("IDEA mandates individualize 'appropriate' education for disabled children, it does not require a school district to provide a child with the specific education placement that [her] parents prefer."). Whereas Moog can focus more narrowly on teaching students how to hear and speak, public schools are statutorily mandated to ensure that students are mainstreamed into the regular academic environment to the maximum extent appropriate. As the caselaw explains, this might not maximize the student's potential or provide the best possible education at public expense, but it is the law. *See id*. "The purpose of the IDEA is 'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'" *Id*. (quoting *Rowley*, 458 U.S. at 192).

Finally, much of the difficulty formulating Taylor's IEPs lies with the Parents, who unilaterally removed her from the District in August of 2004, enrolling her at Moog instead.

72

In *T.F. v. Special School District of St. Louis County*, the Eighth Circuit faced a similar situation, where the parents—who also unilaterally placed their son in a private residential school—argued that only a full-time residential placement would provide their son "meaningful" educational benefit. 449 F.3d at 821. After noting that the IDEA does not require schools to acquiesce to parents' preferred educational placements, the court quoted *Evans*:

> There was no guarantee that the programs proposed by the Millard [Public Schools] would have accommodated Christine. However, the school district should have had the opportunity, and to an extent had the duty, to try these less restrictive alternatives before recommending a residential placement.

*Id*. (quoting *Evans*, 841 F.2d at 832).

Here, there was also no guarantee that the IEPs proposed by the District would have ultimately accommodated Taylor. The IEPs were designed in a way reasonably calculated, given the information available at the time, to enable Taylor to receive some educational benefits. The District at least should have had the opportunity to try these less restrictive alternatives before a placement at Moog was recommended. Instead, the Parents, who clearly acted with their perceived best interests of their child in mind, decided to place Taylor at Moog because they did not believe the school district could provide the same level of service. Perhaps this is true, but it does not mean the District did not provide an IDEA-compliant IEP.

Because the November 2004 and the March 2005 IEPs provided FAPE for Taylor, the Court grants summary judgment to all Defendants as to Count IV. Further, the Parents'

Complaint alleges in Count III that the certain "facts" found by the administrative panel were clearly erroneous, requiring the administrative order to be overturned. First, the Court finds the so-called "facts" contained in Count III are actually legal conclusions related to Count IV, and are thus incorporated and disposed with in that Count. Moreover, as Parents go to great lengths to explain in their briefing, this is not an appeal and this Court is required to make an independent decision based upon the preponderance of the evidence. *See Pachl*, 453 F.3d at 1068. To the extent Count III does contain facts and not legal conclusions, the Court has independently reviewed the administrative record, made its findings of fact based on a preponderance of the evidence, and disposed of these issues in its discussions relating to Counts I, II and IV. Therefore, summary judgment is granted to all Defendants as to Count III.

> 4.     *Parents Are Not Entitled to Reimbursement for Taylor's Moog Placement*

Of course, Parents are entitled to send Taylor to Moog if they feel that is in her best interests. However, that is not the test for whether the District is obligated to reimburse them for the expense. Under 20 U.S.C. §1412(a)(10)(C)(ii):

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner **prior to that enrollment**.

74

(emphasis added). The Court has determined that the District and its IEP did provide Taylor with a free appropriate public education prior to her August 2004 enrollment at Moog, the only time period relative to this Count under the statute. The District was under no obligation to revise its IEP or reevaluate Taylor on its own prior to that enrollment. The Parents never requested a reevaluation of Taylor or a new IEP prior to her enrollment at Moog. The fact that Chris P. discussed Taylor's hearing loss with a teacher (but did not go into specifics) and that Taylor showed up the last day of summer school with a hearing aid simply is not enough to trigger a duty for the District to immediately formulate a new IEP. Even if it were, it was not unreasonable for the District to wait approximately three weeks—the time between the end of summer school and when Taylor enrolled at Moog—before beginning to formulate a new plan, especially considering that the school was not even in session due to summer break. *See* Mo. Code Regs. Ann. Tit. 5, § 70-742.140 (stating reevaluation may not occur more than once a year without parents and district agreeing otherwise, that district must provide parents with Notice of Intent to Evaluate within 30 days of referral for evaluation (delays permitted for summer breaks), and that evaluation must be completed within 60 days of notice (delays permitted for summer breaks)).

Parents who unilaterally "enroll their child in private school without approval of a public school do so with the risk they will not receive reimbursement for their costs." *See Clynes*, 119 F.3d at 611-12; *see also Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985) ("[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school

officials, do so at their own financial risk."). Here, the record indicates Parents never really considered the District an option before enrolling Taylor at Moog; while they may have thought this was in Taylor's best interest, they also did so at their own financial risk. This Court grants summary judgement to all Defendants as to Count IV.

**B.      The District's Motion for Summary Judgment on Its Counterclaim**

The District moves for summary judgement on its counterclaim for attorney's fees against the Parents and their attorneys [Doc. # 41]. The Parents were granted leave and filed their Answer to the District's Counterclaim [Doc. # 57]; thus, District's Motion for Default Judgment against the Parents [Doc. # 41] is moot. The District argues that it is entitled to reasonable attorney's fees because it was the prevailing party at the administrative level. For the reasons explained below, the Court denies the District's summary judgment.

The District brings its counterclaim under the IDEA, which states:

In any action or proceeding brought under this section, the court, **in its discretion**, **may** award reasonable attorneys' fees as part of the costs–

. . .

(II) to a prevailing party who is a State educational agency or local educational agency against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or

(III) to a prevailing State educational agency or local educational agency against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

76

20 U.S.C. § 1415(i)(3)(B)(i) (emphasis added).  There is little doubt that the District is the prevailing party in this case, and Counterclaim Defendants do not dispute this.  *See Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1030 (8th Cir. 2003) (defining prevailing party).

The District's main contention is that the Parents were repeatedly given copies of the IDEA procedural safeguards, which includes the language found at 20 U.S.C. § 1412(a)(10)(C)(iii):

> The cost of reimbursement described in clause (ii) **may** be reduced or denied--
>
> (I) if–
>
> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>
> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);
>
> . . .
>
> (III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

(emphasis added).  The District notes that courts and administrative hearing officers have treated a failure to provide the requisite notice as a bar to reimbursement claims, even where the school district was determined to have denied the student a FAPE.  *See Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150 (1st Cir. 2004); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513

Case 2:06-cv-04254-NKL   Document 66   Filed 10/03/07   Page 77 of 81

(6th Cir. 2003). Because the Parents had notice of this requirement, the District argues, the Parents knew they were not entitled to reimbursement from the District for Taylor's Moog placement. As a result, their decision to file a Due Process claim against the school was frivolous, unreasonable, or without foundation or presented for an improper purpose.

To the extent that the District's Counterclaim is against the Parents and their attorneys for the initial filing of their Due Process complaint, the Court previously held that 20 U.S.C. § 1415(i)(3)(B)(i) is not retroactive, and prior to that there was no statutory provision allowing the District to recover attorneys fees under the IDEA. *See* August 14, 2007, Order at 6. The Court also held that the December 30, 2005, filing of a new statement of issues by the Parents and their attorneys did not initiate a new action, and thus section 1415(i)(3)(B)(i) cannot apply to that particular instance either. *See id*. As a result, the District essentially can only recover attorney's fees if Plaintiffs "continued to litigate after the effective date of the statute what had become a frivolous or unreasonable claim." *Id*. As explained below, the District has not shown this.

It is true that the Parents enrolled Taylor at Moog without giving proper notice to the District. However, it does not follow that failure to give notice under section 1412(a)(10)(C)(iii) automatically means the Parents' Due Process claim was frivolous, unreasonable or without foundation or presented for an improper purpose, making them liable for attorney's fees under section 1415(i)(3)(B). First, although this Court held the District was not under any obligation to reevaluate Taylor prior to her enrollment at Moog, this was certainly not a forgone conclusion. Moreover, the notice requirement in section

78

1412(a)(10)(C)(iii) presupposes that a court or administrative officer has decided the parents are entitled to reimbursement. The plain language of the statute explains "cost of reimbursement described in clause (ii) **may** be reduced or denied." Thus, it was possible that the Parents might have prevailed on their claim and may have been entitled to reimbursement. The adjudicator, in its discretion, then may or may not have decided to reduce or deny the cost of reimbursement. Importantly, though, the statute makes this *discretionary*; no matter how the District phrases it or the cases they cite, there is nothing indicating that, contrary to the plain meaning, the word "may" should be read as "must" in either sections 1412(a)(10)(C)(iii) or 1415(i)(3)(B)(i).

The District has not cited, and the Court has not found, any Eighth Circuit case directly addressing section 1415(i)(3)(B)(i). The Ninth Circuit notes, though, that the IDEA's fee-shifting provision, section 1415(i)(3)(B), is nearly identical to 42 U.S.C. § 1988(b). *See Aguirre v. Los Angeles Unified Sch. Dist.*, 461 F.3d 1114, 1117 (9th Cir. 2006). In *Dillon v. Brown County, Neb.*, 380 F.3d 360 (8th Cir. 2004), a case involving whether a defendant was entitled to attorney's fees under section 1988(b), the Eighth Circuit admonished district courts to "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." 380 F.3d at 365 (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978)); *see also Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 848 (8th Cir. 2006) (in section 1981 case, court held that although plaintiff failed to show discrimination "she brought her claim in good faith

79

and it was not frivolous or unreasonable"); *Khan v. Gallitano*, 180 F.3d 829, 837 (7th Cir. 1999) (affirming district court decision that plaintiff's "claim was not frivolous because, although it was meritless, it was a good faith argument for an extension of existing law").

This Court holds that the Parents, although they ultimately failed to show that the District did not provide Taylor with FAPE, did have some good-faith basis in their Due Process claims, and their action was not frivolous, unreasonable, or without foundation or presented for any improper purpose. There was some evidence that a teacher at the District had concerns about Taylor's ability to hear during the summer of 2004, that Chris P. shared some amount of information with a District teacher regarding Taylor's loss of hearing, and that Taylor eventually showed up at school with a hearing aid. It was not a forgone conclusion that the District would prevail on that issue. Had the Parents prevailed in showing the District failed to provide FAPE to Taylor, yet did not give the appropriate notice, they could still have been awarded reimbursement, as reduction or denial is completely discretionary under section 1412(a)(10)(C)(iii). To hold otherwise would only serve to discourage parents from advocating for the rights of their children. *Cf. Dickerson ex rel. Ingram v. Brodgen*, 80 F. Supp. 2d 1319, 1323 (S.D. Ala. 1999) (refusing to borrow shorter limitations period for attorney's fees in IDEA cases because it would discourage parents from bringing claims).

This Court exercises its discretion under section 1415(i)(3)(B) and denies the District's request to award it attorney's fees against the Parents. Because the District cannot show that the Parents continued to litigate a frivolous or unreasonable claim after the

80

effective date of the statute, it similarly cannot recover attorney's fees against their attorneys, Takiff and Hansen.

**C.    Counterclaim Defendants Takiff and Hansen's Motion to Strike Counterclaim**

To the extent that this Court's August 14, 2007, Order addresses the issues contained in Takiff and Hansen's Motion to Strike, those issues are disposed of. Otherwise, the Motion to Strike is denied as moot.

**IV.    Conclusion**

Accordingly, it is hereby

ORDERED that Defendant Poplar Bluff R-I School District's Motion for Judgment on the Administrative Record [Doc. # 39] and Defendant Missouri Department of Elementary & Secondary Education's Motion for Summary Judgment [Doc. # 41] are GRANTED. Plaintiffs' Motion for Summary Judgment [Doc. # 43], the District's Motion for Summary Judgment on its Counterclaim [Doc. # 41], and Counterclaim Defendants Takiff and Hansen's Motion to Strike [Doc. # 50] are DENIED.

                                              s/ Nanette K. Laughrey
                                              NANETTE K. LAUGHREY
                                              United States District Judge

Dated:  October 3, 2007
Jefferson City, Missouri

81